[Cite as *State v. Maloney*, 2018-Ohio-316.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 27269 |
| | : | |
| v. | : | T.C. NO. 2016-CR-00312 |
| | : | |
| LINDRELL E. MALONEY | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 26th day of January, 2018.

. . . . . . . . . .

HEATHER N. JANS, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

BEN M. SWIFT, Atty. Reg. No. 0065745, P. O. Box 49637, Dayton, Ohio 45449
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the September 16, 2016 Notice of Appeal of Lindrell E. Maloney. Maloney appeals from his judgment entry of conviction on two counts of rape (under thirteen), in violation of R.C. 2907.02(A)(1)(b), felonies of the first degree, and two counts of sexual battery (natural parent), in violation R.C. 2907.03(A)(5), felonies of the third degree. The victim herein is Maloney's biological daughter, N.S. Maloney was sentenced to a mandatory term of 10 years to life on Count I, rape (under thirteen); to a mandatory concurrent term of 10 years to life on Count III, rape (under thirteen); to 60 months on Count II, sexual battery (natural parent); and to 60 months on Count IV, sexual battery (natural parent), with Counts II and IV to be served concurrently to each other and consecutively to Counts I and III, for a total term of 15 years to life. Maloney was also designated a Tier III sex offender.

{¶ 2} Maloney was indicted on March 10, 2016, and he pled not guilty on March 29, 2016. On July 8, 2016, Maloney executed a "Waiver of Jury." On July 15, 2016, Maloney filed "Defendant's Motion to Dismiss," arguing that the State failed to preserve exculpatory evidence, namely the DNA swabs from the rape kit of the victim, N.S. The State opposed the motion to dismiss on July 18, 2016, asserting that "[t]o date, the State has provided all discovery to Defendant, including the outstanding * * * DNA lab results which was [sic] emailed to the State on July 15, 2016." The trial court overruled Maloney's motion to dismiss on August 4, 2016. According to the court, "as the State notes, the Miami Valley Regional Crime Laboratory sent the results of the rape kit analysis to the State on July 15, 2016, and those results were made available to Defendant's counsel on the same day."

{¶ 3} The bench trial commenced on August 18, 2016. At the start thereof, the following exchange occurred:

THE COURT: * * *

We went through, previously, withdrawal of the jury on this case. And that's been filed. So the record should reflect that.

I just want to take a moment just to reiterate that with you, Mr. Maloney. It was your desire and is your desire to waive a jury on this and try all matters to this Court, to the Bench; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. I just wanted to make sure of that.

Before we begin, is [sic] there any preliminary matters the Court needs to address? Let's start with the State?

MS. CONNELLY: Yes, Your Honor. Thank you. About a week ago, up until about a week ago, there were no plea offers or negotiations between the State and the Defense.

Last week, the State made an offer to the Defendant to plead to one count of rape by force which would carry a 3 to 11 mandatory sentence and a gross sexual imposition under 13 which would carry with it a 12 to 16 month sentence[1] which is not mandatory. We would leave the sentencing open to argue for the Court to decide. And that would, by virtue of that plea that would take away the life tail that he is looking at with the rape under 13.

---

[1] We note that gross sexual imposition (under 13), in violation of R.C. 2907.05(A)(4), is a felony of the third degree, and pursuant to R.C. 2929.14(A)(3)(a), the sentencing range is 12 to 60, not 12 to 16, months.

And he rejected that offer.

THE COURT: Mr. Thompson, did you relay that offer to your client and discuss it with him?

MR. THOMPSON: Yes, I did, Your Honor. We did discuss the matter is some detail. And after discussing it, Mr. Maloney informed me that he wished to reject that offer and go forward with trial today.

THE COURT: Very well. Is that correct, Mr. Maloney?

THE DEFENDANT: Yes, sir.

{¶ 4} Dr. Kent Depue was the first witness to testify. He stated that he is a physician employed at Dayton Children's Hospital in the emergency department. He stated that on October 25, 2015, he examined N.S. due a "report of possible sexual abuse," specifically two incidents of digital vaginal penetration. The following exchange occurred:

Q. * * * And so she came into the emergency department for that reason?

A. That's correct.

Q. * * * And when she came into the emergency department and you were told that that was the chief complaint, what kind of exam do you give a patient when that is the complaint?

A. So, typically, as far as these sort of circumstances go, our social workers are called immediately. They're the ones who take the history. So physicians or residents or whoever, typically not even nurses, get very limited history, so.

As far as the details of what happened in these specific circumstances, we leave it to them to take the history. They then come and report to us exactly what the history is. And then we proceed with the examination. I typically do a cursory examination, you know, heart, lungs, you know, that sort of general thing.

And then our SANE nurses who are trained for evidence collection in these circumstances will take them into another room that has our setup for such things, get them into position, do their evidence collection and then have me come in and do an examination.

{¶ 5} Depue stated that N.S.'s examination was normal, and that a normal exam is "definitely not" determinative of whether or not sexual abuse occurred. He stated that "[w]hen these circumstances arrive almost always there is no physical evidence of abuse." When asked if he would expect to see trauma following digital penetration, Depue responded that it "would depend on how vigorous it was." On cross examination, Depue stated that he "cannot, by physical examination, determine whether someone has had sex or vaginal penetration just by looking at them." He stated that in the course of the exam, he "found no evidence of trauma," and that N.S. was not complaining of any pain.

{¶ 6} Robert Lingo testified that he is employed as a detective at the Trotwood Police Department. He stated that on October 25, 2015, he was employed as a patrol officer, and that he responded to a call involving N.S. on that date. He stated that he responded to an apartment complex where N.S. resided, and that Maloney's girlfriend, J.S., pulled into the parking lot behind him with N.S. in the car. Lingo stated that Maloney

was following them in a different vehicle. According to Lingo, Maloney was eventually placed into the back of a cruiser because he "was yelling angrily something to the effect that you know that this is all false" while Lingo was attempting to speak to J.S. Lingo testified that Maloney "stated that he felt that the victim was confusing incidents from an incident several weeks prior that involved her having a shaving bump or something to that effect, starting to bleed and that he helped her with it." Lingo stated that Maloney remained in the cruiser while J.S. gathered personal items from the residence, and that she and N.S. then went to the hospital. Lingo stated that he advised Maloney of his rights before speaking to him in the cruiser, and that Maloney agreed to speak to him. On cross examination, Lingo stated that J.S. reported to him that Maloney "had stuck his thumb into [N.S.'] vagina."

{¶ 7} N.S. testified that she turned 13 in July of 2016, and that she is in the seventh grade. She stated that last year she resided with Maloney and J.S., as well as her little sister. N.S. stated that in October of 2015, she "got in trouble because a girl got in my face. First time I got in trouble because a girl jumped in my face and called me out my name and I smacked her out of my face." N.S. stated that she received an in-school suspension and that she told her father about it. The following exchange occurred:

Q. * * * Did something else happen at school then?

A. Yeah, I missed the bus the first time I got in trouble.

* * *

Q. * * * Can you tell us what happened when you missed the bus?

A. When I missed the bus, I came back in the house and I told my dad. And he was, he woke up and said you just wanted to stay here

because my cousin, [K. W.] was here. And I said no. And then when he got up - - I was going in my room to change my clothes and he told me to come here and I told him to hold on because I was trying to put on some pants. And then he said you don't tell me to hold on. And he made me come here. And then I sat on the couch. He put me on his legs and then that's when he started putting his finger in my private part.

{¶ 8} N.S. stated that her private part is her vagina. She stated that K.W. spent the night with N.S. the night before and did not have to go to school, and that K.W. was still asleep in N.S.' bedroom when N.S. came back inside the apartment. She stated that her father had been sleeping on the couch in the living room, and that he was angry that she missed the bus. N.S. stated that she wanted to change her clothes because she had been rushed, and "when I finally looked at myself, I looked ridiculous." She stated that when she left her room and went into the living room, she was wearing "a pink shirt and underwear." N.S. testified that Maloney said, "do you think the 'S' word is a game? I said no. He said you just trying to miss the bus because K.W. was here. I said, no, I didn't." According to N.S., "he said didn't I tell you I was going to put my foot up your butt. And then that's when he started putting his thumb in my private part." N.S. stated that she could not say anything "because I was crying." N.S. stated that Maloney stopped when K.W. came out of the bedroom and went into the bathroom. She stated that K.W. then returned to the bedroom without entering the living room. N.S. stated that she did not remember the date of the abuse but that it happened on a Friday in October.

{¶ 9} The following exchange occurred:

Q. * * * And I want to take you, then to the next day.

* * *

Q.   All right?   Saturday?

* * *

A.   Yes.

Q.   Can you tell me what happened?

A.   That Friday I got in trouble.

* * *

Q.   Now hold on.  Was this the time - - well, how did you get in trouble on Friday?   What did you do?

A.   That's the time when a girl jumped into my face and I smacked her out of my face.

Q.   And that's when you got the ISS.

A.   Yes.

Q.   * * * And so then on Saturday - - when did you tell your dad that that had happened?

A.   I told him that Friday but he didn't do anything about it.

* * *

Q. * * * So then on Saturday, what happened?

A.   He said, it was just me and him in the house, * * * and I was sitting on the couch like this way and I had my legs on the couch and my head and things were facing towards the back of the couch.

* * *

Q.   * * *   So you're not sitting on it like normal?

A.   Yeah, I'm not sitting on it normal.

Q.   * * * So go ahead.

A. * * * He was sitting on the floor.   And then that's when he started to play with me.

Q.   What do you mean by that?

A.   Like tickle me and stuff and hold me tightly.   And then he was holding me tightly and I hate being held down, so I'm trying to move.   And he squinched [sic] my legs, like my body together and like held me.   And then that's when he was like, then he was putting his fingers in my pants and stuff and I had on some shorts.   He put his finger in my pants and he was shoving in my private part [sic].   And I was crying, I was screaming and crying.

{¶ 10} N.S. stated that Maloney reached inside of her shorts and underwear.   She stated that he "said that just because he * * *   didn't do nothing that day didn't mean that he wasn't going to do nothing.   So then that's when he kept continuously saying you think stuff is a game."   When asked how Maloney was speaking, N.S. replied, "Like.   You think s**t is a game, you think s**t is a game."   N.S. testified that no one else was in the apartment at the time.   N.S. stated that when J.S. returned home, she told N.S. to get ready to go to her grandmother's house, and that when "we was in the car I told her I had to tell her something in this;   I was like I'll tell you when we pull off * * *."   According to N.S., "when we pulled off, I told her and she was like, 'For real; no he didn't.'   And I said yes, he did.   And that's when she started crying and she called him and was like, 'So you put your finger in [N.S.'] private part.' "   When asked if she could hear Maloney's

response in the phone call, N.S. responded, "[h]e was like, no, no, I didn't. Very calmly." N.S. stated that J.S. then called "her Aunt Francis and the police."

{¶ 11} N.S. additionally testified that she remained in J.S.' car while J.S. spoke to the police, and that Maloney called J.S.' phone from the police cruiser, which she answered. N.S. testified that "he tells me to lie and tell me to tell them that he was looking at a bump on my private part. And I told him no, I put that on my little sister, * * * what is wrong with you." When asked what "put that on" meant, N.S. responded, "Like I sweared (sic) on her."

{¶ 12} N.S. stated that after J.S. spoke to the police, N.S. "went to get my things from inside of the apartment that we were in. And then we called my grandma to see where she is and she was at Kohl's * * * in Trotwood. And we pulled * * * over there and waited for my grandma to come outside." She stated that J.S. spoke to her grandmother and "we went to the hospital like I think that night or another night." N.S. stated that Maloney had told her not to tell anyone about the abuse. She stated that she now lives with her grandmother.

{¶ 13} On cross examination, N.S. testified that K.W. is the daughter of Maloney's brother. She stated that in the first incident, Maloney put his thumb in her vagina, and that it was very painful. She stated that the first incident on Friday lasted "[l]ike two minutes," and that she did not experience bruising or bleeding. She stated that afterwards, "when I went into my room to put on my clothes, I woke [K.W.] up and I told her that my dad put his finger in my private part. And she was like (demonstrating) and put the cover back over her head and went back to sleep." N.S. stated that her father drove her to school after the Friday incident. She stated that after school, when she got

home, she asked K.W. if she had heard what she told her about the abuse in the morning, and that K.W. indicated that she heard what N.S. told her. N.S. stated that she did not tell any teachers at school what had happened. She stated that during that school year, she "had Ds and Fs" and "a couple Cs and a couple As." She stated that Maloney punished her for her bad grades by making her stay in her room, and "I have to give up my phone and my TV." The following exchange occurred:

Q. * * * You said you got into a fight at school with a girl?

A. It wasn't like a fight. I just, I considered it I was removing her out of my face.

Q. Removing her out of your face?

A. Yes.

Q. * * * Was that, did you physically do that?

A. Yes.

* * *

Q. How did - - can you tell me a little bit about that?

A. She jumped in my face and called me out my name which was the "B" word.

Q. Okay.

A. And I'm walking, minding my own business. So my choice was to smack her out of my face.

* * *

Q. And, in fact, you received an in-school suspension for that.

A. Yes.

Q.   * * * And did your father place you on punishment for that, also?

A.   No.

Q.   He never did?

A.   He didn't do anything.

Q.   * * * Did he talk to you about it?

A.   He did not do nothing that day.

Q.   * * * Did he do anything later that month?

A. Yes.   That Saturday he, I was sitting on the couch and that's when he was playing with me and he was holding me up like tight - -

Q.   Uh-huh

A. - - and I was trying to get loose.   And that's when he put his finger in my private part.

Q.   * * * And that was - -

A.   His thumb. * * *

Q.   * * * So the first time - - and I'm kind of going off your earlier testimony - - was on a Friday, correct?

* * *

A.   The first time was on a Friday.   Later that Friday, I got in trouble at school and got ISS.   And then I told him about it.   He didn't do anything. And then that Saturday that's when he put his finger in my private part.

Q. * * *   That Saturday was following the Friday.

A.   Yes.

* * *

Q. * * * Now when this - - so it happened twice.

A. Yes.

Q. * * * And the Friday, did he put his thumb inside your vagina?

A. Yes.

Q. * * * And the following Saturday he repeated that and put his thumb?

A. Yes.

Q. So on both times it was his thumb. Are you sure about that?

A. Yes. I'm positive.

Q. * * * Did you see him? Could you see him when he inserted it or how did you know it was his thumb and not a finger?

A. Because if it was his finger, I would've felt his finger. It was his thumb because he was (indicating) and injected it in my private part.

**{¶ 14}** N.S. stated that she was in pain at school the entire day on Friday. She stated that her little sister was asleep when the incident occurred on Friday, and that J.S. was at work.

**{¶ 15}** On re-direct examination, N.S. stated that prior to the incidents on Friday and Saturday, if she got into trouble her father would "make me take off all of my clothes from like my shirt and my bra and my underwear and my pants and my socks and my shoes. And he'll make me bend over the couch and he'll get the belt and he'll whoop me." She testified that "[t]hat happened multiple times when I have got in trouble at school." N.S. stated that she did not make up the allegations of abuse because she was being punished. She stated that K.W. is close to Maloney. N.S. stated that she and her

father were watching "The Young and the Restless" when the incident happened on Saturday. When asked why she did not tell anyone at school what had happened to her on Friday, N.S. responded that Maloney "told me not to tell anyone or he would kill me."

{¶ 16} Melinda Kaiser testified that she is employed at Eastway Behavioral Healthcare as a nurse practitioner. She stated that her "role is to assess and treat mental health problems" for her patients. Kaiser testified that she began seeing N.S. monthly as a patient in January 2016, and N.S. "was referred by her school" due to disruptive behavior and reported physical, emotional, and sexual abuse by her father. Kaiser stated that N.S. was in therapy at South Community prior to coming to Eastway Behavioral Healthcare, and that she had been diagnosed with attention deficit disorder and oppositional defiant disorder. Kaiser testified that she completed a psychological assessment of N.S. and diagnosed her with attention deficit disorder, oppositional defiant disorder, and also post-traumatic stress disorder. When asked what made her conclude that N.S. had post-traumatic stress disorder, Kaiser responded, "Her reported history of the abuse as well as her symptoms related to that. She had intrusive thoughts about it. She had nightmares about it. She had flashbacks about it." Kaiser stated that N.S. takes medication for post-traumatic stress disorder. Kaiser stated that N.S.' mental health is improving due to "medication management, the therapy, as well as a more stable loving home environment" with her grandmother. She stated that her issues at school have also improved. Kaiser testified that pre-existing behavioral problems can be exacerbated by physical or sexual abuse.

{¶ 17} On cross-examination, Kaiser testified that N.S. was referred to her by her school for her behavior problems, and by Children's Services for the allegations of sexual

abuse. On re-direct examination, she stated that N.S. discussed "being hit by her dad and sexually abused by her dad." Kaiser testified that such abuse can be a cause of post-traumatic stress disorder.

{¶ 18} J.S. testified that she has a two-year old child with Maloney, who is her boyfriend, and that she is expecting a second child with him. She stated that she lived with N.S. in October 2015. J.S. stated that she contacted the police because of what N.S. reported to her. She stated that she spoke to Maloney, and that they "didn't have a long conversation. I just asked him and he was sleeping and he didn't know what I was talking about." J.S. testified that she was employed at Tenneco in October 2015, and that she worked from 6:00 a.m. to 3:00 p.m. Monday through Friday. She stated that after the police responded to her call, she took N.S. to the hospital. J.S. denied crying when N.S. reported the abuse to her.

{¶ 19} On cross examination, J.S. testified that Maloney denied the allegations, and that "he thought I had made her say it because me and him got into a [sic] argument." She asserted that while she was talking to the police, her phone rang and N.S. answered it. J.S. stated that N.S. advised her that Maloney put his thumb in her private part, "and she didn't really have a story to tell me. She just said that's all that happened." J.S. stated that N.S. was not being punished at the time, and that "she was kind of always on some sort of punishment but he never was never really stuck out his punishment [sic]." J.S. stated that she did not have concerns for the safety of her own daughter, who was one at the time, and that she "just kept thinking how could [N.S.] say this."

{¶ 20} J.S. testified that she had custody of N.S. for a while, because N.S.' "mama was giving up custody of all her children then and Lindrell couldn't get it at that moment.

So it went through a list of people and * * * I had to go to court to get it, Juvenile Court." She stated that Maloney eventually got custody. J.S. stated that she met N.S. "when she was around 8. She was always hyper." J.S. stated that N.S. "started getting in trouble often in school. She started lying." According to J.S., once while Maloney was incarcerated, N.S. told N.S.' grandmother "that I was whooping on the kid when I didn't never whoop her then." She stated that at a later time, "when [Maloney] was about to get out of jail, maybe a month before or close to couple weeks, [N.S.] had told them that I was feeding her old food," which J.S. asserted was untrue. J.S. stated that N.S. "got into a fight once. And she would often get suspended off the bus and she wouldn't tell us when she got suspended. She would act like she missed the bus." J.S. stated that she took N.S. to the hospital on the night of October 25, 2015, and that she was not complaining of any pain.

{¶ 21} Detective Natalie Watson testified that she is employed by the City of Trotwood Police Department, that she was assigned to N.S.' case on October 26, 2015, and that she "contacted CARE House to set up a forensic interview." Watson talked to Maloney and he advised her "that his daughter is known to lie when she's off her medication," and that N.S. "was on punishment and wanted to get off of punishment." Watson stated that she asked Maloney about his initial explanation about the shaving bump, and that Maloney stated that J.S. told N.S. "that she needed to start shaving her pubic hair. He was not okay with that because she was 12 years old but he said that she had came to him. She had a bump on her vagina that was bleeding and she had came to him, showed him and he cleaned it with some alcohol." Watson testified that she confirmed that N.S. received an in-school suspension on the Friday that she was initially

abused.

**{¶ 22}** On cross examination, Watson indicated that she set up an appointment to meet with Maloney, and that she met him at the Trotwood Police Department conference room for an interview that lasted 45 minutes. Watson stated that at the time she interviewed Maloney, he was free to leave at any time, he was not under arrest, and he completed the entire interview without leaving. She stated that she met with him again in the Montgomery County Jail to obtain a DNA swab from him, which she submitted to "BCI." The following exchange occurred:

> Q.   * * * Do you know if that ever came back?
>
> A.   Yes.
>
> Q.   * * * Do you know the results of that?
>
> A.   I don't know them verbatim but.
>
> * * *
>
> BY MR. THOMPSON:
>
> Detective, I'm handing you what's been marked for purposes of identification as Defendant's Exhibit A.
>
> MS. CONNELLY:   Your Honor, can we approach?
>
> THE COURT:   Yes.
>
>    (At sidebar)
>
> MS. CONNELLY:   It's a lab report by Amy Dallaire and she's not Amy Dallaire.   She's not able to testify to it.
>
> THE COURT:   What's the purpose of showing her the report?
>
> MR. THOMPSON:   She testified about taking the DNA on October

15th.  So I was going to show her that to confirm that she did take it.

THE COURT:   Well, she admitted she took it.

* * *

MR. THOMPSON:   Oh.   This is the result of it though.

THE COURT:   Well, she can't testify as the result [sic].   She doesn't have the qualifications to testify to that.   She testified she took it and where it went.

* * *

THE COURT:   So that's about as far as you can go with that.

{¶ 23}  At the conclusion of the State's case, defense counsel moved for an acquittal under Crim. R. 29.   The court overruled the motion.

{¶ 24} K.W. then testified for the defense that she is 14, that Maloney is her uncle, and that N.S. is her cousin.   She stated that she has a "real close bond" with N.S.   K.W. stated that she spent the night at N.S.' house in October 2015, and that she did not have school the next morning.   K.W. testified that N.S. got up in the morning and got ready for school, "but she missed the bus."   According to K.W., N.S. "came back in the house.   And I was up with her sister," who was one year old.   K.W. testified that she was in the front room with N.S.' sister, and that N.S. told her that "she was going to find a reason to leave."   K.W. stated that "my uncle told her to put back on her book bag and stuff and he was taking her to school because she thought she wasn't going because I didn't have it."   K.W. stated that N.S. retrieved her book bag from the back of the house, that her sister and she followed N.S., and then they "all came to the front room."   K.W. stated that she did not observe her uncle do anything inappropriate to N.S.   According to K.W., N.S.

never told her that Maloney touched her inappropriately. When asked if N.S. ever came to her while she was in bed and told her that her father touched her inappropriately, K.W. responded, "[t]he only thing she told me was she was going to find a reason to leave." K.W. stated that N.S. wanted to leave "from that house" because "she was going to a psychiatrist and she missed her mom. And she was failing so she was in trouble." K.W. stated that she, N.S., Maloney, and the baby sister left the house together.

{¶ 25} On cross examination, K.W. stated that she is very close to Maloney and that she spends a lot of nights at his home. When asked, "And you don't want to see him get in trouble * * *," K.W. responded, "I'm speaking the God honest truth." She stated that she has spoken to her mother, father, and grandmother about the case.

{¶ 26} The following day, at the start of the proceedings, the following exchange occurred:

THE COURT: * * * Is there any matters to put on the record before we start this morning?

* * *

THE COURT: From the Defense?

MR. THOMPSON: Just, Your Honor, that I did submit this Court's offer to Mr. Maloney and at this time he doesn't want to go forward with it.

THE COURT: The record should be clear. It wasn't any Court's offer. I just wanted him to reconsider what the State had offered yesterday before we began. Since we didn't have a jury, I thought that was a good opportunity to spend some time to do that this morning, so.

MR. THOMPSON: Okay.

THE COURT:   I appreciate you talking to him. * * *

{¶ 27}  Finally, Maloney testified that he obtained custody of N.S. when he was released from incarceration on March 11, 2014.   He stated that N.S.' biological mother "was unstable to take care of her so I stepped in and I started taking care of her." Maloney stated that N.S. was six at the time. According to Maloney, N.S. is "cool for the most part but she got troubles.   She got troubles.   She'd be lying.   You know, she'd play both sides, she manipulative to get what she want."   Maloney stated that he disciplined N.S. by taking "her stuff that she needed," and that he also spanked her.   He stated that he was no longer spanking N.S. in October 2015 because he "felt like she was getting too old to be getting spankings so I just started taking her stuff that she liked like her phone, TV, new shoes, clothes."   According to Maloney, N.S. was exhibiting behavioral problems in October 2015, and she "would be acting out, lying and making up stories to try to get out of the house.   And, you know, I wasn't really going for that so I just kept her on punishment."

{¶ 28} When asked what the punishment consisted of, Maloney responded that N.S. "couldn't have nothing, her phone, TV, her new shoes, her new clothes.   The only thing she could do is come out the room when she needed to take a shower, when she needed to eat, finish her homework and go to bed or go to school."   At the time, Maloney testified, N.S. "was mad, throwing stuff, telling me she going to run away, all types of stuff."   Maloney testified that he told N.S. that "you can go back with your mom if you want to.   And she cried, said no, that she ain't going to get nothing.   I said well then you going to have to start behaving then or this is what the punishment is."   Maloney stated that N.S. was specifically punished for fighting "[s]ome girl" at school.   He stated that he

learned of the fight when the teachers called him, that he asked N.S. about it, and that she "lied to me." According to Maloney, N.S. was "on a thing to where on a regular school basis * * * she'd bring a note home every day and it states her behavior, it states what she did for that day and her homework. Because previous times, she was hiding her homework in her locker, wasn't bringing it home, lying to me about it like she didn't have no homework." Maloney stated that N.S. "would come, lying to me about she about to catch the bus knowing she got kicked off the bus, so [sic]."

{¶ 29} Maloney stated that he initiated counseling for N.S. around May 2015, and that she went every two weeks. He stated that N.S. was prescribed medication, and he made sure she took it every morning. Maloney stated that N.S. "was unruly for real." He stated that he encouraged the relationship between N.S. and K.W. because he "wanted [K.W.] to rub off on [N.S.] because [K.W.] is like in sports and her grades is getting good and she, you know, she don't lie; she tell the truth. * * *."

{¶ 30} On the Friday when N.S. missed the bus, Maloney stated that when she returned to the apartment, K.W. was sitting on the couch in the living room putting clothes on N.S.' baby sister. Maloney testified that when N.S. came inside, he told her "like you ain't about to stay here just because [K.W.] here. I'm like, man, get your book bag back up and we're about to go. And I dropped her off at school." He stated that he, N.S., K.W., and N.S.' baby sister all left together in the car. Maloney testified that none of the abuse that N.S. described occurred. Maloney stated that he has six daughters, aged "[t]wenty, 16, 16, 13, 7 and 2 and about to have another girl." He stated that he has never been accused of sexual abuse by his other daughters.

{¶ 31} On cross examination, Maloney stated that he obtained custody of N.S.

"because something happened to her before. * * * Somebody had tried to touch her before and I took custody of her because her mama wasn't doing nothing about it." According to Maloney, N.S. made up the allegations against him "to go back to her mama."

**{¶ 32}** Before closing arguments, the parties stipulated to the authenticity of a video of N.S.' CARE House interview, and the court viewed the video in open court. The video was admitted as Joint Exhibit I.

**{¶ 33}** After closing arguments, the court took a recess to deliberate. After reconvening, the court indicated as follows:

The record should reflect that the parties are present with the Defendant.

Normally, the Court would just read the verdicts but I think some explanation would be in order here. I'm not going to go through all the explanations but I will hit some highlights.

First of all, I'm going to say that defense counsel in the closing argument was very accurate in his first statement that he made that someone is lying. I think that's very clear in this case. And the Court is the trier of fact in this case. And the Court must determine who is lying. I must determine the credibility of the witnesses and apply those tests of truthfulness.

I've heard testimony. I've watched the demeanor of the witnesses. I've reviewed the reasons for the things they said or their motivation involved, their motivation for not telling the truth and any biases they may have.

In judging the credibility, I also looked to see if testimony could be corroborated. I found there was corroboration of the victim, [N.S.], in several respects. The Court finds that her in-court testimony, first of all, and her video testimony that was offered by the defense and made a joint exhibit submitted to this Court to be consistent.

Defense in this case argued that the motivation of the victim was to get out of punishment and go live with her mother. The Court does not find this to be supported by the evidence in this case.

Now, it is true that the victim did not immediately tell anyone right away that this offense had happened but the Court finds that this is not unusual in these type of cases.

However, it should be noted that when the victim, she testified that she felt safe when [J.S.] picked her up and as they were driving away from the Defendant, she told her of this incident.

Now it's obvious that [J.S.] has a relationship with the Defendant and is motivated to protect him and I can understand that. But at the time she picked up the victim, it was obvious that she believed the victim enough to immediately call the police and take her, too, to be examined at Children's Hospital and believed her enough that she had her own daughter examined at the hospital, as well.

Now, although the physical exam did not reveal any trauma, Dr. Depue did testify that just because something is inserted in the vagina does not mean that there would be trauma.

There's no dispute that the victim in this case had behavioral problems. No one disputes that. No one disputes the fact that she was in counseling with diagnosis of PTSD until after this incident which is some corroboration that something happened. Along with the PTSD were the flashbacks and the nightmares as testified by her current or recent counselor.

{¶ 34} The court then indicated it found Maloney guilty of each count, and further found that N.S. was under the age of 13. When asked if he had anything to say, Maloney then advised the court as follows:

The doctor that was used for the prosecution on behalf of the State to see if there was penetration and now couldn't tell whether it happened or not. But I already stated that there was no penetration, tearing or bruising on my paperwork.

I would like to resubmit that paperwork that I received from the same doctor that you used to, that you used against me clearing me of penetration, tearing and bruising which, to wit, you used to convict me. This (indiscernible) behavior leads me to believe this whole court proceeding is a railroad case that you, the judge, prosecutor and this lack of knew what would happen. [sic]

The person who was representing me did not tell me about the ten or the five-year deal that was offered to me in court till after found guilty [sic]. I feel like you went off a [sic] opinion instead of the facts due to the fact that you refused true statement on DNA which is used in every rape case these

days but for some reason not mines (sic) when it could clear my name of any of these charges.

I would like to show that I have the evidence that clears me of any rape, any sexual crime ever. This is the DNA evidence. The doctor statements, no penetration, none of that. I got all of the evidence that suggested I did nothing wrong. They even had a search warrant from my DNA that I'd like to show. Twice they came and got my DNA and then you-all tell me I can't use my DNA to clear my name when I'm clearly innocent of all these charges that's held against me.

I feel like I was ill-ly (sic) represented. He didn't tell me about the five year deal or the ten year deal that was offered to me and I feel like I should've knew about that instead of proceeding through the Court, you know what I mean, the Court stipulations.

But I do have the DNA evidence that excludes me from any rape, any sexual battery, any indication of rape that my so-called lawyer was supposed to submit that clear my name from any rape or any wrongdoing in this case.

{¶ 35} Defendant asserts two assignments of error herein. His first assigned error is as follows:

THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUSTAIN MALONEY'S CONVICTIONS AND MALONEY'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 36} According to Maloney, while "a rape victim's testimony, *if believed*, may be

adequate to meet the State's burden of production of trial, in this case, we must ask ourselves: **What are we to believe?**   The victim in this case gave inconsistent versions of what happened, on what day, and how it happened."   According to Maloney, N.S.' testimony in the video of her CARE House interview and her trial testimony are inconsistent.   According to Maloney, "N.S. has accused her Father of raping her and she cannot even explain *how it happened*. She initially told her step-mother that he used his *finger*.   She told the hospital that he used his *finger*.   She told the [CARE] House interviewer that he used his *finger*.   She adamantly told the trial court that he used his *thumb*."   Maloney asserts that N.S. told the CARE House interviewer that K.W. entered the living room in the course of the abuse, but that she told the trial court that K.W. did not enter the living room.   Maloney argues that N.S. told the CARE House interviewer that when the abuse occurred on Saturday, J.S. was at work, and she testified in court that J.S. and her baby sister were at her step-grandmother's home on Saturday. Maloney argues that while N.S. testified that she went to the hospital Saturday night, the evidence at trial shows that she was examined on Sunday. Maloney asserts that N.S. "cannot even explain *what* she was wearing" when the abuse occurred. He asserts that while N.S. told the CARE House interviewer that she told J.S. about the abuse on Saturday, she told the CARE House interviewer that she told J.S. the following Sunday.

{¶ 37} Maloney argues that "N.S. lies to get what she wants."   He notes that K.W.'s testimony conflicts with that of N.S.   Maloney argues that N.S. wanted to leave her father's home and get out of her punishment.   He notes that J.S. "was not concerned about their child's safety."   According to Maloney, "the evidence shows that [N.S.'] Father has been nothing more than a caring and loving Father and a disciplinarian when

it came to N.S.'s bad behavior." He directs our attention to his and J.S.'s testimony regarding N.S.' propensity to lie. Maloney notes that "the school referred N.S. to Eastway for her issues with anger, aggression, oppositional defiance [dis]order, being argumentative and impulsive." He notes that N.S.' post-traumatic stress disorder diagnosis "was made solely on N.S.'s self-reporting." He argues that the "evidence in this case points more to a manipulative, troubled child making up a story to get out of the house, than her Father raping her." Maloney asserts that N.S.' "testimony is not sufficient to sustain a conviction for rape and sexual battery against her Father,"

{¶ 38} The State responds that N.S.' CARE House interview and her testimony at trial "were consistent. N.S. was consistent with respect to the identity of the offender, her relationship to the offender, and the impermissible sexual acts that occurred when she was 12 years old." The State asserts that the definition of "finger" includes the thumb.

{¶ 39} As this Court has previously noted:

"A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). When reviewing whether the State has presented sufficient evidence to support a conviction, "the relevant inquiry is whether any rational finder of fact, after viewing the evidence in the light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable

doubt." *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997), citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A guilty verdict will not be disturbed on appeal unless, "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

\* \* \*

\* \* \* To reverse a judgment as being against the manifest weight of the evidence, an appellate court must determine that "the jury clearly lost its way and created \* \* \* a manifest miscarriage of justice." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). \* \* \* "It is well established that the trier of fact may credit some, part, or none of the testimony of a witness." *State v. Pheanis*, 2d Dist. Montgomery No. 26560, 2015-Ohio-5015, ¶ 29, citing *State v. Butt*, 2d Dist. Montgomery No. 22774, 2009-Ohio-6814, ¶ 19; *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

"The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve." *State v. Hammad*, 2d Dist. Montgomery No. 26057, 2014-Ohio-3638, ¶ 13, citing *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "The trier of fact is better situated than an appellate court to view witnesses and to observe their demeanor, gestures, voice inflections and to use those observations in weighing credibility." *State v. Jackson*, 2d Dist. Montgomery No. 26050, 2015-Ohio-5490, ¶ 50, citing *State v. Lewis*, 4th Dist. Scioto No. 01CA2787, 2002 WL 368625 (Feb. 25, 2002). "[T]he appellate court may not

substitute its judgment for that of the trier-of-fact on the issue of credibility of the witnesses unless it is patently apparent that the factfinder lost its way." *Id.* at ¶ 81, citing *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997). * * *

*State v. Wilson*, 2d Dist. Montgomery No. 27001, 2016-Ohio-7329, ¶ 6, 10-11.

**{¶ 40}** R.C. 2907.02(A)(1)(b) proscribes rape and provides: "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." R.C. 2907.03(A)(5) proscribes sexual battery and provides: "No person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender is the other person's natural or adoptive parent * * *."

**{¶ 41}** We initially note that we have viewed N.S.' CARE House interview, Joint Exhibit I. Therein, N.S. stated that Maloney is her father and that he is 35 years old. N.S. stated that in the first incident of abuse, after she missed her school bus, Maloney kept saying that "I think things are a game." She stated that he placed his finger "in my hole of my private part." N.S. stated that she was "screaming, crying," and when K.W. woke up, Defendant acted like he was yelling at N.S. "or just whooped me or something, which he didn't." She stated that K.W. went into the bathroom and he "kept continuing to put his finger in my private part." She stated that "when he got done," she went into the bedroom where K.W. had gone and told K.W. that Maloney "put his finger in my private part." She stated that her little sister was also home, who was one year old. N.S. stated that Maloney took her to school, and that she did not tell anyone because he told her not to do so. She stated that "it was hurting all day" and she "had my legs crossed." When

asked about the details of the first incident, N.S. stated that Maloney stopped the abuse when K.W. entered the living room, and that he began it again when she went into the bathroom. She stated that she was trying to put her pants on when Maloney called her into the living room. She stated that she then had on only underwear and a pink shirt with a jean jacket. She stated that Maloney's other hand was on her back, "pushing me up" in the course of the abuse. She stated that K.W. went straight to the restroom, and that Maloney "put his finger back in."

{¶ 42} N.S. stated that prior to the second incident, she got in trouble in school after she hit a girl and received an in-school suspension. She stated that a "few days went by" and on the weekend Maloney was "acting like he was all fun and games," and then he "put his finger in my private part." She stated that he said, "You see how I can be all nice and then switch up on you." She stated that no one else was home at the time. N.S. stated that when J.S. came home on Sunday, she disclosed the abuse to her. N.S. stated that Friday was the first time and Saturday was the last time that Maloney abused her. She stated that prior to the second incident, she and Maloney were watching "The Young and the Restless" when the abuse began, and that "we both like so into" the television show. She stated that Maloney then "held me down," and she stated that she hates to be held down. N.S. stated that Maloney kept "kept pushing it in," and asking her, "does it hurt, does it hurt?" She stated that she kept saying yes, and that he told her to walk around the house. N.S. stated that her little sister was at daycare and J.S. was at work at the time. She stated that J.S. began to cry when she told her about the abuse, and that she called Maloney and asked him if N.S. was telling the truth. N.S. stated that Maloney denied abusing her, and that he sounded very calm. She stated that Maloney

has "a really bad anger problem," and that he is "not no calm person." N.S. stated that J.S. said "it had to be true" because of Maloney's calm response. She stated that K.W. put the bed covers over her head when she told her about the first incident.

{¶ 43} N.S. further stated that Maloney would "whoop" her by making her take off all of her clothes, spread her legs and bend over the couch, and that J.S. told him to stop the practice because "that's not how you whoop a girl." She stated that "it happened every year." N.S. stated that her "private" is her vagina. N.S. stated that she did not have to touch Maloney in the course of the abuse. N.S. stated that she was across the street in J.S.' car when the police arrived. She stated that she and her little sister were both examined at the hospital because J.S. "didn't know if [Maloney] would have touched" her sister. N.S. stated that Maloney called J.S.' cell phone from the police cruiser and that she answered the call while she was in the car. She stated that Maloney said, "you better lie." N.S. said that she responded, "I put it on my sister," and "I'm not gonna lie over something this serious." She stated that she told him, "I'm not about to sit here and lie for you" and hung up on him.

{¶ 44} Regarding Maloney's assertion that N.S.' testimony was unreliable, we disagree. The inconsistencies, such as whether Maloney abused N.S. with his thumb or his finger, or exactly when the abuse occurred, or the whereabouts of J.S. during the second incident of abuse, or the inconsistencies between N.S.' version of events and K.W.'s testimony, do not render N.S.' consistent version of events unreliable. As the State asserts, N.S.' CARE House interview and her trial testimony were consistent in alleging that Maloney, N.S.' father, on two occasions, sexually abused N.S. in her home, by means of digital penetration, once after she missed the school bus and returned to the

apartment, where her cousin and baby sister were present, attempted to change her clothes, and went into the living room in a shirt and underwear at Maloney's insistence after she told him to "hold on," and once while she and her father were alone in the apartment while she was on the couch, after he held her down. Her interview and testimony were further consistent regarding Maloney's use of corporal punishment and other discipline.

{¶ 45} N.S.' testimony was corroborated in large part by the testimony of the other witnesses, as the trial court determined. Melinda Kaiser testified that N.S. was referred to her for reported physical, emotional, and sexual abuse at the hands of her father. J.S.' testimony established that N.S. reported the abuse to her. J.S. clearly believed N.S.' allegations as noted by the trial court. J.S. confronted Maloney, reported the allegations to the police, and took N.S. to the hospital. N.S. stated in her CARE House interview that J.S. had N.S.' little sister examined at the hospital as well. J.S. testified consistently with N.S. that N.S. answered J.S.' cell phone in the car while J.S. spoke to the police. J.S. stated that N.S. "didn't really have a story to tell me," and told her "that's all that happened," and N.S. did not accuse Maloney of further sexual abuse beyond the digital penetration. Detective Watson confirmed N.S.' report that she received an in-school suspension on the Friday that she was initially abused after missing the bus. While K.W. adamantly testified that N.S. was motivated by a desire to leave Maloney's residence, she further testified that she spoke to her mother, father and grandmother about this matter, all of whom have an interest in protecting Maloney.

{¶ 46} Finally, the court had the opportunity to hear all of the witness testimony and view the CARE House interview, and the court credited N.S.' testimony and found

that it was corroborated in "several respects." We defer to the trial court's credibility assessment. Accordingly, we conclude that, viewing the evidence in a light most favorable to the State, a rational finder of fact could have found the essential elements of rape and sexual battery proven beyond a reasonable doubt, and that the finder of fact did not lose its way and create a manifest injustice. In other words, Maloney's convictions are supported by sufficient evidence and not against the manifest weight of the evidence. For the foregoing reasons, Maloney's first assignment of error is overruled.

{¶ 47} Maloney's second assignment of error is as follows:

MALONEY WAS DENIED HIS CONSTITUTIONAL RIGHT OF DUE PROCESS THROUGH CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 48} According to Maloney, defense counsel "was ineffective for failing to engage in reasonable investigation and preparation." He specifically argues that defense counsel failed to subpoena school and daycare records "to indicate N.S.'s time of late arrival at school or the baby's arrival at daycare," since the "records may have given the trial court a time line to assist as to whether the alleged acts could have occurred within that amount of time." Maloney further asserts that defense counsel "was ineffective for failure to communicate a plea offer." He argues that in addition to the plea offer placed in the record by the prosecutor, "a second plea offer was extended prior to the second day of trial that was not communicated to Maloney by his trial counsel." Maloney asserts that "[t]his second offer was an off the record offer for a prison term of five (5) years. The original plea offer did not contain an agreement as to sentencing." Maloney asserts that "at the end of the trial, on the record, Maloney even told the Judge

that his attorney did not tell him about the ten OR five-year deal that was offered to him until after he was found guilty."

{¶ 49} Maloney asserts that defense counsel was further ineffective "when he improperly advised Maloney to waive a jury." According to Maloney, "on July 8, 2016, at the pre-trial conference, a jury waiver was signed by Maloney and the Judge did discuss the effect of a jury waiver on the record." He asserts that "it was clear that Maloney was visibly upset with the amount of time since his arrest and the need for a continuance because the DNA evidence was still outstanding and the Doctor was unavailable to testify." Maloney directs our attention to: "CD: July 8, 2016 Pre-Trial Conference and Jury Waiver," which is not part of the record before us. Maloney asserts that "trial counsel advised Maloney to waive a jury because the Judge would go strictly off the evidence. Because Maloney was anxious to have his day in court and thinking that trial counsel would present his evidence, he waived a jury on advice of counsel." Maloney argues that it "is very clear from this record that counsel's advice was bad, especially in light of the evidence NOT presented by him. Thus, Maloney's waiver was not knowingly, intelligently or voluntarily given."

{¶ 50} Maloney argues defense counsel "was ineffective for failure to subpoena expert testimony concerning DNA analysis and results." He asserts that a "rape kit was performed, and [N.S.'] clothing would have been collected," and that Detective Watson obtained a sample of Maloney's DNA, but that the "DNA results were not a part of the evidence at trial." Maloney argues that at the pre-trial conference on July 8, 2016, the DNA results "were still outstanding. * * * The case was continued for counsel to be afforded an opportunity to review the results prior to trial. * * * However, no DNA

comparison results were admitted at trial because the lab professional was not available to testify and the Doctor who performed the rape kit was not available to testify." Maloney asserts that he "complained to the trial court on the record that he felt like he was poorly represented." Finally, Maloney asserts that defense counsel "was ineffective for failure to file a motion to suppress his statements to the police."

{¶ 51} The State responds that "Maloney cannot demonstrate that these alleged errors would have resulted in the outcome of the proceedings being any different, and, therefore, his second assignment of error fails." Regarding the alleged failure to investigate, the State responds that "even if the school/daycare records indicated that neither N.S. nor the baby were late on the day of the offense, this does not negate the ability of Maloney to have committed the offense." Regarding the plea offer, the State asserts that not "only does the record not establish that an offer was made to Maloney, but the record also does not establish that there was a reasonable probability that he would have accepted the plea even if it had been offered to him."

{¶ 52} Regarding the jury waiver, the State asserts that "Maloney does not contend that he did not understand the proceedings or indicate how his decision was involuntary," and any "argument that Maloney would have been found not guilty after a jury trial is merely speculative and cannot constitute ineffective assistance of counsel." Regarding defense counsel's alleged failure to subpoena expert testimony concerning DNA analysis and results, the State argues that in "criminal cases, DNA is not always found," and "even if Maloney's DNA was not found in the rape kit, this does not amount to a situation in which the outcome of the trial would have been different had a DNA expert testified at trial." The State asserts that "[w]ithout having a proffer of the documentation as part of

the record to consider, this claim should more appropriately be raised in a petition for post-conviction relief and, accordingly, be overruled." Finally, regarding Maloney's assertion that defense counsel was ineffective for failing to file a motion to suppress, the State responds that "[n]othing in the record demonstrates that Maloney was coerced into making any statements or that he did not knowingly, intelligently, and voluntarily agree to speak with police." According to the State, Maloney cannot demonstrate prejudice.

{¶ 53} As this Court has previously noted:

> To prevail on an ineffective-assistance of counsel claim, a defendant must show deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To show deficiency, a defendant must show that trial counsel's representation fell below an objective standard of reasonableness. *Id.* Prejudice exists and a reversal is warranted only where a defendant shows a reasonable probability that but for counsel's deficient performance the result of the proceeding would have been different. *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989).

*State v. Ward*, 2d Dist. Montgomery No. 26773, 2016-Ohio-5354, ¶ 9.

{¶ 54} "A debatable decision involving trial tactics generally does not constitute a deprivation of effective counsel. *State v. Phillips* (1995), 74 Ohio St.3d 72, 656 N.E.2d 643, 1995-Ohio-171." *State v. Russell*, 2d Dist. Montgomery No. 21458, 2007-Ohio-137, ¶ 50. "Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. * * *." *State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964, ¶ 37 (2d Dist.).

{¶ 55} Regarding defense counsel's alleged failure to investigate and subpoena N.S.' school records and her little sister's daycare records, as the Ohio Supreme Court has noted:

It is axiomatic that effective representation of a client carries with it a burden to investigate. " * * [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland, supra*, 466 U.S. at 691, 104 S.Ct. at 2066. See, also, *Powell v. Alabama* (1932), 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158.

*State v. Bradley,* 42 Ohio St.3d 136, 146, 538 N.E.2d 373 (1989).

{¶ 56} We conclude that there is nothing in the record to indicate that the school and day care records may have been exculpatory, thereby necessitating their investigation; Maloney merely speculates that the records "*may have* given the trial court a time line to assist as to whether the alleged acts could have occurred within that amount of time." N.S. testified that the abuse that occurred on Friday lasted only a couple of minutes, and that Maloney then drove her to school. N.S., Maloney and K.W. testified that Maloney wanted N.S. to immediately leave the home and not stay there with K.W. Even if the records demonstrated that N.S. arrived on time on Friday, this does not preclude a finding that Maloney had sufficient time to commit the offense. We have no basis to conclude that the records would have altered the outcome of the trial. Accordingly, we find that ineffective assistance in this regard is not established.

{¶ 57} Regarding defense counsel's alleged failure to communicate a second plea offer, the record does not support Maloney's argument of ineffective assistance. At the start of trial, the prosecutor advised the court of the *one* offer it extended to Maloney, namely a plea to one count of rape by force, with a mandatory sentence of three to 11 years, along with a plea to gross sexual imposition (under 13), with a non-mandatory sentence of "12 to [60]" months, thereby avoiding a potential life sentence. Defense counsel confirmed to the court that he relayed the offer to Maloney and discussed it with him "in some detail," and Maloney confirmed that he rejected the offer. On the second day of trial, defense counsel indicated that he again submitted the plea offer to Maloney, and that Maloney again rejected the offer. The court indicated that it "wanted [Maloney] to reconsider what the State had offered yesterday [on the record] before we began," and that the court appreciated that defense counsel again spoke to Maloney about the offer. Not until after he was found guilty did Maloney make a vague reference to "the ten or the five-year deal that was offered to me in court." We have no basis to conclude that any additional offer was presented to defense counsel, or that Maloney would have accepted the offer, since he consistently maintained his innocence. For the foregoing reasons, we conclude that Maloney fails to establish his counsel's deficient performance regarding the alleged plea offer.

{¶ 58} Regarding Maloney's argument that his counsel's performance was deficient in advising him to waive a jury at the July 8, 2016 pre-trial conference, as noted above, a record of the pre-trial conference is not before us. "App.R. 9 requires an appellant to supply the court with a transcript of prior proceedings necessary for disposition of any question on appeal." *State v. Kreuzer,* 2d Dist. Montgomery No. 98-

CA-100, 1999 WL 959206, * 5 (Aug. 6, 1999). Absent a transcript of the proceedings, we "must presume regularity in the proceedings before the trial court." *Id.*

**{¶ 59}** We further note that R.C. 2945.05 provides: "In all criminal cases pending in courts of record in this state, the defendant may waive a trial by jury and be tried by the court without a jury." Maloney's waiver is part of the record before us. It provides: "I fully understand that under the laws of this state, I have a constitutional right to a trial by jury. I hereby voluntarily waive and relinquish my right to a trial by jury, and agree to be tried by a Judge." It was signed by Maloney on July 8, 2016 and filed on July 14, 2016. As the Supreme Court of Ohio has indicated:

> A jury waiver must be voluntary, knowing, and intelligent. *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 45. * * * A written jury waiver is "presumptively voluntary, knowing, and intelligent." *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 37. Only a "plain showing that the defendant's waiver was not freely and intelligently made" will rebut that presumption. *Id.*, citing *Adams v. United States ex rel. McCann*, 137 U.S. 269, 281, 63 S.Ct. 236, 87 L.Ed. 268 (1942).

*State v. Montgomery,* 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 22.

**{¶ 60}** Maloney acknowledges that the trial judge "did discuss the effect of a jury waiver on the record." The court further confirmed, at the start of trial, that "[w]e went through, previously, withdrawal of the jury on this case." The court specifically confirmed with Maloney that it "was your desire and is your desire to waive a jury on this and try all matters to this Court," and Maloney replied, "Yes, sir." Again, we conclude that Maloney

fails to demonstrate deficient performance and resulting prejudice based upon his jury waiver.

**{¶ 61}** Regarding Maloney's assertion that defense counsel was ineffective for failing to subpoena expert DNA testimony to his prejudice, we conclude that this argument fails for a couple of reasons.   We initially note that just as the absence of physical trauma is not determinative of whether sexual abuse occurred, an absence of DNA evidence linking a defendant to a victim of sexual abuse is also not dispositive; "there is no requirement that testimonial evidence of sexual abuse must be corroborated by physical or other evidence." *State v. Barnes*, 2d Dist. Montgomery No. 25517, 2014-Ohio-47, ¶ 31 (holding that while the only evidence of sexual abuse was the victim's testimony, "the fact that there was no DNA evidence of Barnes' sexual contact with H.S. does not render his conviction against the manifest weight of the evidence"), citing *State v. Kaufman*, 187 Ohio App.3d 50, 2010-Ohio-1536, 931 N.E.2d 143, ¶ 71 (7th Dist.). Even if we were to conclude that defense counsel's performance was deficient for failing to subpoena expert testimony concerning DNA analysis of N.S.' rape kit, on this record we cannot conclude that the outcome of the trial would have been otherwise had counsel done so.

**{¶ 62}** Finally, regarding Maloney's argument that defense counsel was ineffective for failing to file a motion to suppress his statements, we again disagree.   "A defendant's statement to police is voluntary absent evidence that his will was overborne and his capacity for self-determination was critically impaired due to coercive police conduct. *Coloradao v. Spring* (1987), 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954; *State v. Otte*, 74 Ohio St.3d 555, 562, 1996-Ohio-108."   *State v. Buk-Shul*, 2d Dist. Montgomery No. 23603, 2010-Ohio-3902, ¶ 9. Detective Lingo testified that he read Maloney his rights

in the cruiser before speaking to him, that Maloney agreed to speak to him, and no evidence was offered that he admitted to the allegations against him. Detective Watson stated that Maloney was free to leave her interview with him at any time, and that he completed the interview. As the State asserts, there is no evidence that Maloney's statements to police were involuntary due to coercive police conduct or subject to suppression. Further, the adduced statements were exculpatory, not inculpatory. Accordingly, we find no deficiency in defense counsel's failure to file a motion to suppress, a matter of trial strategy, and that Maloney has failed to establish that the outcome of his trial would have been otherwise if counsel had filed the suppression motion.

{¶ 63} For the foregoing reasons, Maloney's second assignment of error is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and HALL, J., concur.

Copies mailed to:

Heather N. Jans
Ben M. Swift
Hon. Dennis J. Adkins