[Cite as *State v. Mitchell*, 2018-Ohio-4032.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
WASHINGTON COUNTY

STATE OF OHIO,                          :
                                        :       Case No.  17CA30
        Plaintiff-Appellee,             :
                                        :
        vs.                             :       DECISION AND JUDGMENT
                                        :       ENTRY
TYLER PURVIS-MITCHELL,                   :
                                        :
        Defendant-Appellant.            :       **Released: 09/28/18**
_____

APPEARANCES:

Darren L. Meade, Parks and Meade, LLC, Columbus, Ohio for Appellant.

Tyler Purvis-Mitchell, Pro Se Appellant.

Kevin W. Rings, Washington County Prosecuting Attorney, and Alison L. Cauthorn, Washington County Assistant Prosecuting Attorney, Marietta, Ohio, for Appellee.
_____

McFarland, J.

        **{¶1}** Tyler Purvis-Mitchell appeals his conviction from the Washington County Court of Common Pleas for one count of felonious assault, F.C. 2903.11(A)(1), a felony of the second degree.  For the reasons which will follow, we overrule the two assignments of error and affirm the judgment of the trial court.

FACTS

{¶2} Appellant was indicted by the Washington County Grand Jury on one count of felonious assault for an altercation which occurred in the Washington County Jail on November 11, 2016 involving Appellant and another inmate, Robert Rhodes. As a result of the altercation, Rhodes permanently lost vision in his left eye.

{¶3} On February 24, 2017, Appellant pleaded not guilty to the single count and initially appeared with court-appointed counsel. However, on March 14, 2017, Attorney George Cosenza filed a notice of appearance on Appellant's behalf as well as a motion for discovery. Appellant proceeded to jury trial on July 17, 2017.

{¶4} At trial, both Appellant and Robert Rhodes testified as to the facts and circumstances surrounding the incident. The State also presented testimony from several employees of the Washington County Jail, and the physician who treated Rhodes after the altercation. Rhodes' testimony will be set forth more fully below. However, the essence of his testimony was that he was not at fault in starting the altercation. He also denied any use of racial epithets against Appellant prior to or during the incident.

{¶5} Marry Perry testified she is the control room operator for the Washington County Jail. Her job duties entail monitoring the 62 security

cameras. Around 11:20 p.m. on November 11, 2016, there was a disturbance in the men's area, C-Dorm. When she saw a fight ensue, she notified other corrections officers to respond. As the video of the incident played, Perry testified that the recording represented a fair and accurate copy of what happened.[1] The trial transcript indicates the video has no audio.

{¶6} On cross-examination, Ms. Perry testified the security cameras are constantly recording. The DVR computer system itself determines how far anyone can go back in time to capture events and has nothing to do with the jail personnel's capabilities. Perry knew nothing about the nature of any video five hours prior to the incident.

{¶7} Margaret King, another corrections officer at the Washington County Jail, testified she responded to the altercation scene. After Rhodes was escorted out of the area, King and another officer ordered the other inmates to line up and show their hands so they could identify the other participant. No one, including Appellant, offered that information. King observed Appellant with redness and swelling on his knuckles on both hands. She identified and authenticated State's Exhibit F as Appellant's hands.

---

[1] Perry testified the only editing which had been done to the recording was when it showed the camera zooming or changing direction as she watched the incident unfold.

{¶8} Tyler Stephens, also a deputy sheriff corrections officer at the Washington County Jail, testified he responded to the incident. When he arrived in C-Dorm, Rhodes was lying by a table with some blood coming out of his face. Stephens assisted in removing Rhodes from the area and cleaning the blood on his face and arm. Stephens was ordered to take photographs of the area. Stephens identified States' Exhibits B, C, D, and E which, respectively, depicted Rhodes' face, eye, and blood where Rhodes' was lying.

{¶9} Lieutenant Jeff Young of the Washington County Sheriff's Office also responded to the incident. He escorted Rhodes to medical and later went to the control room to watch the video for the purpose of finding out who else participated in the altercation. Young testified that the security camera system records continuously.

{¶10} On cross examination, Lieutenant Young testified he automatically made the video of the incident, pursuant to protocol for such occurrences. He testified he started the video a minute or so prior to the incident. Young also testified to his knowledge, no video recording was made of the time period prior to the copy he made. The video is automatically preserved for approximately 30-40 days.

{¶11} On redirect, Young testified he would not have been able to retrieve the video 3-4 months after the incident. He also testified he had never received a complaint from Appellant with regard to alleged threats or verbal assaults from Rhodes.

{¶12} Dr. Ralph Lim, an ophthalmologist at Marietta Memorial Hospital, testified as to Rhodes' eye injury. When he encountered Rhodes at the hospital ER, he testified the area around Rhodes' left eye was swollen shut, with clear fluid and blood seeping from it. Dr. Lim described the eye at that time as grossly deformed, like "stepping on a grape." He advised Rhodes that he would do his best to salvage the eye but the prognosis to keep his vision was "probably next to nothing." Dr. Lim performed surgery to repair the globe, and Rhodes was eventually transferred to Ohio State to see a retina specialist. Dr. Lim opined that Rhodes' left eye injury was consistent with a traumatic series of blows to his eye.

{¶13} Very briefly summarizing Appellant's testimony, he countered that Rhodes had taunted him 45 minutes to an hour prior to the incident using racial epithets which were not captured on the video shown in the State's case. He also testified Rhodes threatened to "knock him out" and rape him. Appellant used force because he feared Rhodes' threats.

{¶14} The trial court instructed the jury as to self-defense; however, Appellant was convicted of the sole count. He was later sentenced to a three-year term of imprisonment to be served consecutively to "any other federal sentence being served."

{¶15} This timely appeal followed. On January 18, 2018, appellate counsel filed a brief setting forth one assignment of error. On February 8, 2018, Appellant pro se filed a supplemental merit brief setting forth an additional assignment of error.[2] The State filed its response to both assignments of error. Additional facts are set forth below, where pertinent.

ASSIGNMENTS OF ERROR

I.    "THE JURY'S REJECTION OF APPELLANT'S SELF-DEFENSE CLAIM IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BECAUSE THE EVIDENCE IS INSUFFICIENT TO PROVE THAT MR. PURVIS-MITCHELL WAS AT FAULT IN CREATING THE SITUATION, AND THAT HE DID NOT HAVE REASONABLE GROUNDS TO BELIEVE THAT HE WAS IN IMMINENT DANGER OF BODILY HARM.

II.   MR. PURVIS-MITCHELL'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL DURING THE PRETRIAL AND TRIAL STAGE WAS VIOLATED AS COUNSEL FAILED TO DO A PROPER PRETRIAL INVESTIGATION INTO THE LAW, FACTS, AND CIRCUMSTANCES OF THE CASE, AND THEN CALL THE APPROPRIATE

---

[2] Appellant's pro se brief is captioned "Supplement Merit Brief" [sic]. Although it contains one sentence referencing it as a "post-conviction motion," nothing else suggests it should be considered as anything but as part of a direct appeal.

DEFENSE WITNESSES COUPLED WITH
COUNSEL'S FAILURE TO FILE THE APPROPRIATE
MERIT-WORTHY MOTIONS."

ASSIGNMENT OF ERROR ONE

{¶16} In the brief filed by appellate defense counsel, it is argued that Appellant's conviction for felonious assault is erroneous because the jury's rejection of his self-defense claim is against the manifest weight of the evidence. Counsel asserts that the evidence at trial supported a finding that Appellant was not at fault in creating the situation and that Appellant had a reasonable belief he was facing imminent bodily harm. For the reasons that follow, we disagree.

STANDARD OF REVIEW

{¶17} When an appellate court considers a claim that a conviction is against the manifest weight of the evidence, the court must dutifully examine the entire record, weigh the evidence, and consider the credibility of witnesses. The reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve. *State v. Waller,* 4th Dist. Adams No. 17CA1044, 2018-Ohio-2014, at ¶ 17; *State v. Clark*, 4th Dist. Highland No. 14CA20, 2015–Ohio–5003, ¶ 7, citing *State v. Wickersham,* 4th Dist. Meigs No 13CA10, 2015–Ohio–2756, ¶ 25; *State v. Issa,* 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Murphy,* 4th

Dist. Ross No. 07CA2953, 2008–Ohio–1744, ¶ 31. "In determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment must be made in favor of the judgment and the finding of facts. * * * If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Seasons Coal Co. Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn.3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, 91–192 (1978). An appellate court will generally leave the issues of evidence weight and credibility to the fact finder, as long as a rational basis exists in the record for its decision. *Clark* at ¶ 8, quoting *State v. Picklesimer,* 4th Dist. Pickaway No. 11CA9, 2012–Ohio–1282, ¶ 24. Thus, once the reviewing court finishes its examination, the court may reverse the judgment of conviction only if it appears that the fact-finder, when resolving the conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Wickersham, supra,* at ¶ 9, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Finally, a reviewing court should find a conviction against the manifest

weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.,* quoting *Martin,* 20 Ohio App.3d at 175; *State v. Lindsey,* 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000).

## LEGAL ANALYSIS

1. Does the evidence support a finding that Appellant had a reasonable belief of imminent bodily harm?

2. Does the evidence support a finding that Appellant was at fault in creating the situation between the victim and himself?

{¶18} Because Appellant's arguments are interrelated, we consider them jointly. First, counsel argues the trial court erred when it rejected Appellant's claim that he had a reasonable belief that he was in danger of bodily harm. Counsel cites Appellant's testimony that 45 minutes prior to the incident captured on the jail security video, another incident occurred. This alleged incident was not captured on video and not available to be shown to the jury at trial. As to this first alleged incident, Appellant testified that Robert Rhodes entered the recreation room and engaged Appellant with threats of physical and sexual harm coupled with racist remarks. Counsel asserts that Appellant's testimony as to these facts demonstrates that Appellant formed a sincere belief that Rhodes intended to cause him great

bodily harm.  Counsel's second argument is that the trial court also erred when it implicitly found Appellant was at fault in creating the situation.

{¶19} The State's response to both arguments is that Appellant's claims are supported only by his self-serving testimony.  The State asserts that the video evidence, demonstrating Appellant as the first aggressor, speaks for itself.  The State argues Appellant's credibility is "lacking" because he never advised investigating officers that he was involved in the altercation or that he was defending himself.

{¶20} We begin by setting forth the pertinent trial testimony.  Robert Rhodes testified he is 39 years old, divorced, with 3 children.  He is a union pipefitter and had previously worked as a police officer.  Rhodes estimated he is 5 feet 10 or 11 inches tall and weighs about 187 pounds.

{¶21} On November 11, 2016, Rhodes was incarcerated at the Washington County Jail in C-Dorm, serving a 40-day jail sentence.[3]  On that evening, Fort Frye High School was playing in a regional championship game.  Rhodes' son, in high school at the time, apparently played on the football team.  Rhodes wanted to watch the WTAP television station for "Football Frenzy" after the regular 11:00 p.m. news to see football game highlights and scores.

---

[3] It is unclear whether Rhodes was serving time for a probation violation and/or protection order violations involving his ex-wife and/or children.

{¶22} Rhodes testified the television in C-Dorm was mounted "high enough" on the wall that it could be viewed for those standing or sitting. At this point of the trial, the State played the jail security video and Rhodes' narrated the events captured on it, as there is no audio. The trial transcript reveals Rhodes testified that the video showed him coming downstairs and standing in front of the television in C-Dorm. Rhodes did not change the channel. Rhodes testified other people, including Appellant, were sitting in the background watching WTAP. Rhodes was not blocking their ability to see the television.

{¶23} Rhodes further testified Appellant arose from his seat, approached him, and turned off the television. Rhodes turned it back on, and the two went back and forth several times. Rhodes testified as follows:

Rhodes:    He says that I'm not allowed to watch the TV
           because I used to be a law enforcement officer and
           he's a federal inmate, so he gets to pick who
           watches the TV and what they watch, because he's
           doing the most time. * * *

State:     Did you ever tell him that he wasn't allowed to
           control the TV because he's black?

Rhodes:    No, sir. State of Ohio owns that TV.

State:     How many times you guys play with the remote
           back and forth there?

Rhodes:    Seven or eight, possibly.

State:　　　　And is- - is he changing the channel or just turning it on and off?

Rhodes:　　　At this point, there's a remote on the wall, and he's pretty much just got his hand there, just hitting whatever, so it's going on, off, channels going up, down.  It's- -

* * *

State:　　　　What's happening now?

Rhodes:　　　At this point, Mr. Purvis-Mitchell is calling me a pig, calling me a po-po (phonetic), calling me a cop.  Telling me when he gets out of jail, he's going to rape and kill my 10 year old daughter.  He's going to rape my 17-year-old son.  He's going to kill me, because I used to be a cop.  Cops aren't allowed to watch his TV. * * *

State:　　　　What happened there?

Rhodes:　　　He shoved my hand away and changed the channel on the TV and told me I wasn't watching TV. * * *

State:　　　　What happened there? Please pause. What did you see happen there?

Rhodes:　　　As soon as I let my hand down off the remote and backed away from the TV and took my eyes off of Mr. Purvis-Mitchell, he hit me in the face.* * *

State:　　　　Was that the first punch that was thrown?

Rhodes:　　　Yes, sir.

State:　　　　Please continue.  What's going on now?

Rhodes:　　　At this point, he's telling me that he's going to whip my ass, he's going to kill me.

State:　　　　Stop.  You saw that fight start in front of the TV.

What happened then?

Rhodes: At one point, I kind of squared up to kind of protect my face * * * I'm not going fight anybody and catch another charge in the county jail, but at the same time, I'm going to try to protect myself a little bit. So I square up and he comes at me, just throwing punches.

State: How many times do you remember being struck?

Rhodes: At- - - at my best recollection, Kevin, maybe three, maybe four.

State: Watching this, it's clear you were struck more times than that, weren't you?

Rhodes: Yes, sir.

State: Did you ever, even once, strike the Defendant?

Rhodes: No.

State: Did you ever swing at him and miss?

Rhodes: I'm sure I probably may have.

State: Try to push him away from you?

Rhodes: Absolutely.

{¶24} Rhodes concluded his direct testimony by denying he threatened any physical or sexual harm or violence to Appellant prior to the incident.

{¶25} On cross-examination, Rhodes acknowledged as part of his Ohio police officer training, he receiving training in firearms and defensive

tactics, such as how to subdue an uncooperative suspect.  Rhodes denied any contact with Appellant prior to the incident, save for "casual chit chat."  The video of the incident was played again during Rhodes' cross-examination, which continued as follows:

Counsel:     All right.  Now at some point, you decide to come down.

Rhodes:      Yes, sir.

Counsel:     Had you had any kind of discussion, or verbal argument, or anything with Tyler, prior to you coming down those steps?

Rhodes:      Oh yeah, he told me I wasn't going to be able to watch the WTAP news or the Football Frenzy.

Counsel:     So you did have an argument before you came down these steps?

Rhodes:      No, it wasn't an argument.

Counsel:     Is that- - is that when you told- - well, during this conversation, did you tell him that- - that blacks weren't permitted to control what was watched on that pod?

Rhodes:       Absolutely not. (Laughing.)

Counsel:     And you never called him a nigger?

Rhodes:      No, sir, I did not.

Counsel:     You never said you would fuck him up his nigger's ass?

Rhodes:      No, sir, I did not. (Laughing.)

Counsel:     You never said anything like that?

Rhodes:     No, sir.

{¶26} Defense counsel continued, inquiring about a recorded statement Rhodes gave at the Washington County Sheriff's Department a couple of months after the incident.

Counsel:     What officer took the statement from you?

Rhodes:     I believe it was Cory Huffer, was his name.

Counsel:     Okay.  Did you tell Officer Huffer in that statement that if you saw Mr. - - if you saw Tyler again- - and I'll quote - - 'I'll call him a nigger right to his face'?

Rhodes:     Absolutely.

Counsel:     You said that?

Rhodes:     Yes, sir.

Counsel:     You want to go ahead and call him a nigger now?

Rhodes:     No, sir, because he's not threatening to kill my daughter or my son no.

Counsel:     But you did make that statement?

Rhodes:     Yea, after he threatened to kill my daughter and rape my daughter and rape my son and kill my son, yes, I did make that statement.

Counsel:     When you gave this statement to the police, by that time, it was all over, wasn't it?

Rhodes:     Yes, sir. * * *

{¶27} On redirect, Rhodes testified again that he never threw a punch

at Appellant, but he did try to push him away.  Rhodes testified:

State:      Who came up to the TV when you were there
            watching?

Rhodes:     The Defendant, Tyler Purvis-Mitchell.

State:      And the at one point, he walked away and came
            back a second time.

Rhodes:     Yes, sir.

State:      So the first time you were struck you believe it was
            on the back of the head, on the right side of your
            head, is that right?

Rhodes:     Yea, I know it was.  I had a knot there for about a
            week.

State:      Okay, and after that, you simply walked back to
            the TV and began watching the TV again?

Rhodes:     Yes, sir, I really wanted to see how my son did in
            that football game.

State:      And the Defendant came up to you a third time,
            did he not?

Rhodes:     Yes, sir. * * *

State:      The first time where you kind of stumbled back
            and you spun around, you said you were hit in the
            back right side of the back of your head.  Was that
            the first blow that was struck?

Rhodes:     Yes, sir. The first one that was- - the first time I
            got hit was in the back of the head with my back
            towards the Defendant.

State:      Okay, and that was the first blow that was struck in

> this whole incident?

Rhodes:     Yes, sir.

State:      Okay. You hadn't hit him before that.

Rhodes:     No sir. * * *"

{¶28} The defense later presented a differing version of facts as to how the incident started.  However, in the beginning of his direct testimony, Appellant testified he is 23 years old and from Albany, New York. Appellant explained he was being held in the Washington County Jail on November 11, 2016 on federal charges from West Virginia.  On the incident date, he had already pleaded guilty and was awaiting sentencing in the Washington County Jail.  Appellant testified he is 6 feet 1 inch tall and that he had "put on some weight" since November 2016.

{¶29} Appellant testified before the incident with Rhodes, the two had never talked.  There was "word around the dorm" that Rhodes was an ex-cop.  Appellant testified he did not know anything about Rhodes' family, specifically, that he had any children.

{¶30} Appellant testified that approximately 45 minutes to an hour before the portion of the video that was shown to the jury, he was seated, watching 20/20, when Mr. Rhodes yelled from upstairs to change the television.  Appellant testified he did not respond verbally, but looked at

Rhodes as Rhodes made his way downstairs to the television. Rhodes changed the TV station and Appellant changed it back.

{¶31} Appellant testified Rhodes then went back upstairs and on his way, was calling Appellant "black" and "nigger" and saying, "I don't care how black you are, you're not going to be watching TV." Appellant testified Rhodes went "on and on," and at one point, turned and looked at Appellant and explicitly threatened: "I would knock you out, drag you in the back room and fuck you in your nigger ass." Appellant testified he did not respond, but he was uncomfortable and embarrassed. There were only 4 other African Americans in C-Dorm. Appellant walked away from the television for about 40-45 minutes. Rhodes never came downstairs to change the television channel.

{¶32} Appellant testified he was never made aware that Rhodes wanted to watch the TV to see Football Frenzy and watch his son playing football. He testified Rhodes was very aggressive, disrespectful, and uncivilized. It seemed like Rhodes wanted to bully him about the TV. He testified if Rhodes had explained to him why he wanted to watch the TV, there would not have been a problem.

{¶33} Appellant acknowledged he did not report the problem to the corrections officers because he just took Rhodes' words as idle threats.

Also, Rhodes was upstairs and he was downstairs.  Appellant did talk to another inmate, Deandre White, who agreed that Rhodes was "trying to get me upset."  Appellant "cooled off" and went back to watch TV.

{¶34} Ironically for both participants in the altercation, Appellant testified he was watching "Anger Management" when Rhodes saw him, came downstairs again, and yelled: "I told you, black mother fuckers ain't going to be watching the TV."  After saying this, Rhodes stood in front of the TV.  Appellant testified he stood and turned up the volume on the television.  He was tired of being bullied, being called names, and he didn't want the channel changed.  Then Rhodes went over to the television and changed the channel.  Appellant tried to change it back, but Rhodes' hand was against the wall, trying to block the remote control.

{¶35} Appellant testified there was conversation going on, although the video did not also have audio.  Appellant told Rhodes: I'm tired of you trying to bully me at the TV."  Rhodes replied "I don't give a fuck what you're watching.  I'm going to watch the TV now."  As Rhodes had his hand over the remote, Appellant testified he backed up to the television to reach the side panel to change it from the side.  At this point, Rhodes reached out, pushed Appellant and grabbed his shirt.  Appellant testified he pushed

Rhodes away and told him "Don't touch me." Appellant tried to change the channel back.

{¶36} Appellant testified Rhodes moved towards him again, stating: "I think he—he pushes me or he touches me again." At this point, Appellant swung at him and missed. Appellant testified he swung because he began to get scared. Rhodes had threatened to rape him and kill him. Appellant testified:

> "And I'll be honest, I'm no angel. I've been to prison. And I've seen people get sexually assaulted. Prison is a violent place, and when someone threatens to rape me, I take that very seriously."

{¶37} Appellant reiterated that Rhodes pushed him first and started the altercation. The fact that Rhodes was an ex-cop and had trained in combat concerned him. Although he was "a little bigger" than Rhodes, he was afraid Rhodes would have the advantage on him if he didn't defend himself. Appellant thought about pushing the intercom on the wall to get assistance from the officers, but he was afraid to turn his back on Rhodes who had just threatened him.

{¶38} Appellant testified when Rhodes grabbed his shirt, while Appellant was striking him, he fell with Rhodes. When they were on the floor, Appellant kept hitting Rhodes because he didn't want him to get up and attack him. Appellant was trying to get out of the situation safely.

**{¶39}** Appellant testified he did not intend to hurt Rhodes seriously, and was sorry about Rhodes' eye. However, he felt afraid due to Rhodes' aggressiveness and threats. Appellant explained he felt use of force was the only way to protect himself.

**{¶40}** On cross-examination, Appellant testified the federal charge he was being held on was conspiracy to provide a false statement during the purchase of a firearm. He admitted he never reported Rhodes' alleged threats and use of racial epithets to anyone at the jail until after the incident. Appellant even admitted that Rhodes did nothing to prevent Appellant from watching the television and Rhodes did not change the channel. However, Appellant opined that the investigation was "one-sided," and maintained that there was an incident between the two about an hour before when Rhodes called him racial epithets and threatened him, which was not captured on the video shown to the jury. Appellant also admitted Rhodes never went to the remote until he did, never stopped him from watching television, and never swung at him.

**{¶41}** Appellant testified he thought he injured Rhodes' eye: "It just, the noise sounded like something was wrong, and that's when I got up- - and I got up and I walked away." When questioned why he did not initially admit his involvement to the investigating officers, Appellant testified: "I

didn't say anything. I'm going to let them do their job. They're going to find out anyway."

{¶42} The trial court gave the following charge to the jury before it began its deliberations:

> "The Defendant, Tyler Purvis- Mitchell, is asserting an affirmative defense known as self-defense. The burden of proving an affirmative defense by the greater weight of the evidence, is on the Defendant. The Defendant claims to have acted in self-defense. To establish that he was justified in using force not likely to cause death or great bodily harm, the defendant must prove by the greater weight of the evidence, that he was not at fault in creating the situation giving rise to and he had reasonable grounds to believe and an honest belief, even if mistaken, that he was in imminent danger of bodily harm.
>
> * * *
>
> Words alone do not justify the use of force. Result [sic] to such force is not justified by abusive language, verbal threats, or words, no matter how provocative.
>
> In deciding whether Defendant had reasonable grounds to believe, and an honest belief that he was in eminent [sic] danger of bodily harm, you must put yourself in the position of the Defendant with his characteristics, his knowledge or lack of knowledge, and under the circumstances and conditions that surrounded him at the time. You must consider the conduct of Robert Rhodes and decide whether his acts and words caused the Defendant reasonably and honestly to believe that he was about to receive bodily harm."

{¶43} In this case, Appellant contends that the trial court's rejection of his self-defense explanation of his violent actions is against the manifest

weight of the evidence. Essentially, Appellant argues that the jury should have believed his version of events. The weight to be afforded to the evidence and the credibility of testimony are issues to be determined by the trier of fact. *State v. Frazier,* 73 Ohio St.3d 323, 339, 652 N.E.2d 1000 (1995), citing *State v. Grant,* 67 Ohio St.3d 465, 477, 620 N.E.2d 50 (1993). As stated above, the fact finder "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co.,* 10 Ohio St.3d 77 at 80, 461 N.E.2d 1273. Furthermore, a jury is free to believe all, some, or none of a particular witness's testimony. *State v. Scott,* 4th Dist. Washington No. 15CA2, 2015-Ohio-4170, ¶ 25. *State v. Caldwell,* 79 Ohio App.3d 667, 679, 607 N.E.2d 1096 (4th Dist.1992).

{¶44} In this case, both the State and defense counsel vigorously examined Appellant and Rhodes. It is obvious that the jury did not find Appellant's testimony regarding the events which transpired between Rhodes and himself justified his use of force. The jurors were instructed that Appellant must prove he was not at fault in creating the situation which occurred. They were also instructed to put themselves in the position of Appellant, with his characteristics, knowledge or lack of knowledge, and under the circumstances at the time of the incident. And, the jurors were

instructed to consider the conduct of Rhodes, and decide whether his acts and words caused Appellant to reasonably believe he was about to receive bodily harm.

{¶45} While the jury may have not have thought it beyond the realm of possibility that a prior incident occurred between the two, and that Rhodes may have indeed verbally threatened Appellant and used offensive racial epithets, the jury did not conclude Appellant had a reasonable belief of imminent bodily harm. Possibly this was because of the disparity in the ages, height and weight of the two inmates which was testified to by both witnesses and observable on the jail security video shown at trial. In particular, the jury apparently did not find credible Appellant's testimony that he feared for his safety and was too scared to quit hitting and walk away, when questioned as to why he struck Rhodes three additional times when Rhodes was lying on the floor bleeding.

{¶46} The jury also apparently concluded Appellant was at fault in creating the violent situation between Rhodes and himself. The testimony set forth above demonstrates that Rhodes was standing and watching the television mounted on the wall. Though Rhodes was not blocking it, Appellant chose to stand and approach him at the television. Rhodes testified Appellant turned the television off. Appellant testified Rhodes

changed the channel.  While the parties' testimony contrasted on that point, this back and forth exchange over the television channel sparked the remaining events.

{¶47} More importantly, the jury viewed the video showing the physical altercation.  We pause to acknowledge that this court has been unable to view the jail security video played at trial.[4]  The trial transcript, however, reflects that the video was played during Rhodes', Mary Perry's, and Appellant's testimonies.  Perry's testimony authenticated the video. Appellant briefly objected to the relevance of showing the video during Perry's testimony, but the objection was overruled.

{¶48} At the close of the State's case in chief, the video disk was "stipulated into evidence by the parties" and admitted without objection. When portions of the appellate record are not supplied to the court or unavailable for review, we presume the regularity of the trial court proceedings. *See State v. Seymour,* 4th Dist. Ross No.17CA3601, 2018-Ohio-1404, at ¶ 17; *State v. Bailey,* 4th Dist. Scioto No. 09CA3287, 2010-Ohio-2239, at ¶ 60; *State v. McMullen,* 1st Dist. Hamilton No. C-960088,

---

[4] This court was unable to download and view the jail security video. When the DVD containing the video was inserted into the court's media device, the file was listed as Rhodes v. Purvis Mitchell, 11Nov16, and it was listed as an N3R file. According to https://security.panasonic.com, "Since 'N3R' is Panasonic dedicated format, general media player doesn't support this format. However, once you convert data from n3r to mp4 * * * you can play in general media player." *See* enfaq.security.panasonic.com, accessed August 20, 2018.

1997 WL 5183, (Jan. 8, 1997), at *2.[5]  Based on the testimony authenticating the video and the stipulation regarding the video's admissibility contained in the trial transcript, we will presume the security video depicting the events which transpired between Rhodes and Appellant at the Washington County Jail, which we are unable to view, was viewed by the jury.

{¶49} Apparently, this video convinced the jury that Appellant was the physical aggressor.  And, even assuming Rhodes' was verbally aggressive, using racial epithets 45 minutes before the disagreement at the television set, the jury was instructed that no matter how provocative, use of force is not justified.  The jury was in the better position to ascertain the credibility of the witnesses and to weigh their testimonies accordingly, and we will not substitute our judgment for that of the jury.  We find the evidence supports the jury's implicit finding that Appellant's self-defense claim was not plausible.  For the foregoing reasons, we find Appellant's conviction is not against the manifest weight of the evidence.  We hereby overrule the first assignment of error and affirm the judgment of the trial court.

---

[5] In *McMullen,* the appellant claimed that two of his exhibits were not given to the jury, however, the record revealed that state's counsel and appellant's counsel both confirmed for the trial judge that all exhibits that had been admitted into evidence were present when the judge gave the bailiff the exhibits. Under those circumstances, the court presumed the regularity in the proceedings and presume that the jury did in fact receive the exhibits.) *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 400 N.E.2d 384 (1980).

## ASSIGNMENT OF ERROR TWO

{¶50} In Appellant's pro se "Supplement Merit Brief" [sic], he argues his Sixth and Fourteenth Amendment rights to the effective assistance of counsel were violated.  First, Appellant argues there was no proper pretrial investigation into the facts and circumstances surrounding the altercation.  Second, Appellant argues trial counsel failed to call witnesses necessary to his defense.  Finally, Appellant asserts that his trial counsel failed to file appropriate and merit-worthy motions.  For the reasons which follow, we disagree with Appellant's arguments.

## STANDARD OF REVIEW

{¶51} The Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense. The United States Supreme Court has generally interpreted this provision to mean a criminal defendant is entitled to the "reasonably effective assistance" of counsel. *State v. Anderson,* 4th Dist. Lawrence No. 17CA6, 2018-Ohio-2013, at ¶ 22, citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984); *accord Hinton v. Alabama*, 571 U.S. 263, 134 S.Ct. 1081, 1087-1088 (2014) (explaining that the Sixth Amendment right to counsel means

"that defendants are entitled to be represented by an attorney who meets at least a minimal standard of competence").

**{¶52}** To establish constitutionally ineffective assistance of counsel, a defendant must show (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced the defense and deprived the defendant of a fair trial. *E.g., Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *State v. Obermiller,* 147 Ohio St.3d 175, 63 N.E.3d 93, 2016-Ohio-1594, ¶ 83; *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 85.  "Failure to establish either element is fatal to the claim." *State v. Jones*, 4th Dist. Scioto No. 06CA3116, 2008-Ohio-968, ¶ 14.  Therefore, if one element is dispositive, a court need not analyze both. *State v. Madrigal,* 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000) (stating that a defendant's failure to satisfy one of the elements "negates a court's need to consider the other").

**{¶53}** The deficient performance part of an ineffectiveness claim "is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' " *Anderson* at ¶ 23, quoting *Padilla v. Kentucky,* 559 U.S. 356, 366, 130 S.Ct. 1473 (2010), quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052; *accord Hinton,* 134

S.Ct. at 1088. "Prevailing professional norms dictate that with regard to decisions pertaining to legal proceedings, 'a lawyer must have "full authority to manage the conduct of the trial." ' " *Obermiller* at ¶ 85, quoting *State v. Pasqualone,* 121 Ohio St.3d 186, 2009-Ohio-315, 903 N.E.2d 270, ¶ 24, quoting *Taylor v. Illinois,* 484 U.S. 400, 418, 108 S.Ct. 646 (1988). Furthermore, " '[i]n any case presenting an ineffectiveness claim, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.' " *Hinton,* 134 S.Ct. at 1088, quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. Accordingly, "[i]n order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 95 (citations omitted); *accord Hinton,* 134 S.Ct. at 1088, citing *Padilla,* 559 U.S. at 366, 130 S.Ct. 1473*; State v. Wesson,* 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 81.

{¶54} Moreover, when considering whether trial counsel's representation amounts to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Anderson* at ¶ 25, quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Thus, "the defendant must overcome the

presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* Additionally, "[a] properly licensed attorney is presumed to execute his duties in an ethical and competent manner." *State v. Taylor*, 4th Dist. Washington No. 07CA11, 2008-Ohio-482, ¶ 10, citing *State v. Smith,* 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). Therefore, a defendant bears the burden to show ineffectiveness by demonstrating that counsel's errors were "so serious" that counsel failed to function "as the 'counsel' guaranteed * * * by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *e.g., Obermiller* at ¶ 84; *State v. Gondor,* 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62; *State v. Hamblin*, 37 Ohio St.3d 153, 156, 524 N.E.2d 476 (1988).

{¶55} To establish prejudice, a defendant must demonstrate that a reasonable probability exists that " 'but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the outcome.' " *Anderson, supra,* at ¶ 26, quoting *Hinton*, 134 S.Ct. at 1089, quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *e.g., State v. Short,* 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 113; *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus; *accord State v. Spaulding,* 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, at ¶ 91 (indicating that prejudice

component requires a "but for" analysis). " '[T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.' " *Hinton,* 134 S.Ct. at 1089, quoting *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052. Furthermore, courts may not simply assume the existence of prejudice, but must require the defendant to affirmatively establish prejudice. *State v. Clark,* 4th Dist. Pike No. 02CA684, 2003-Ohio-1707, ¶ 22; *State v. Tucker,* 4th Dist. Ross No. 01CA2592 (Apr. 2, 2002). As we have repeatedly recognized, speculation is insufficient to demonstrate the prejudice component of an ineffective assistance of counsel claim. *E.g., State v. Tabor,* 4th Dist. Jackson No. 16CA9, 2017-Ohio-8656, at ¶ 34; *State v. Jenkins*, 4th Dist. Ross No. 13CA3413, 2014-Ohio-3123, at ¶ 22; *State v. Simmons,* 4th Dist. Highland No. 13CA4, 2013-Ohio-2890, at ¶ 25; *State v. Halley,* 4th Dist. Gallia No. 10CA13, 2012-Ohio-1625, at ¶ 25; *State v. Leonard,* 4th Dist. Athens No. 08CA24, 2009-Ohio-6191, at ¶ 68; *accord State v. Powell,* 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 86 (stating that an argument that is purely speculative cannot serve as the basis for an ineffectiveness claim).

## LEGAL ANALYSIS

1. Failure to investigate Appellant's case.

2. Failure to call necessary witnesses.

{¶56} Because Appellant's arguments regarding investigation and calling witnesses are interrelated, we consider them jointly. *State v. Maloney,*--N.E.3d--, 2018-Ohio-316 (2nd Dist.), cited the Supreme Court of Ohio's decision in *State v. Bradley,* 42 Ohio St.3d 136, 146, 538 N.E.2d 373 (1989), at ¶ 55, as follows:

> "It is axiomatic that effective representation of a client carries with it a burden to investigate. '* * * [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.' *Strickland, supra,* 466 U.S. at 691, 104 S.Ct. at 2066. *See, also, Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55 (1932)."

{¶57} We also note that "[g]enerally, decisions to call witnesses is within the purview of defense counsel's trial strategy and is not considered deficient performance absent a showing of prejudice." *State v. Spires,* 4th Dist. Gallia No. 10CA10, 2011-Ohio-3661, at ¶ 30, quoting *State v. Jackson,* 4th Dist. Lawrence No. 97CA2, 1997 WL 749480, at *2, citing *State v. Hunt,* 20 Ohio App.3d 310, 312, 486 N.E.2d 108 (4th Dist.1984).

{¶58} Appellant argues that he explained to his counsel that he acted in self-defense after he was threatened with serious harm. Thereafter, he gave counsel a list of witnesses which should have been interviewed and called for trial. Appellant asserts that counsel initially advised Appellant he

would interview the witnesses and call them for trial, but as the trial date approached, he "changed courses." Appellant contends these witnesses' testimony would have corroborated his own testimony and bolstered his self-defense claim, given that the case hinged on his credibility versus that of Rhodes.

{¶59} In our evaluation of Appellant's arguments, we are constrained by the fact that Appellant supports his claims that counsel failed to investigate his case and failed to call necessary witnesses by his sworn affidavit attached to his supplemental brief. As such, they constitute matters outside of the record. It is simply not permissible on direct appeal to add to the record transmitted from the trial court. *See Morgan v. Eads,* 104 Ohio St.3d 142, 2004–Ohio–6110, ¶ 13 ("[A] bedrock principle of appellate practice in Ohio is that an appeals court is limited to the record of the proceedings at trial."). To this extent, we are unable to address the merits of Appellant's claims that his counsel failed to investigate his case and failed to call necessary witnesses and therefore, rendered ineffective assistance.

{¶60} And, to the extent that Appellant's claim that his attorney did not properly investigate the facts can rely upon the record transmitted on appeal, it is not credible. The record indicates that trial counsel requested, amongst other filings on Appellant's behalf, a motion for discovery, a

motion for permission to photograph the jail area, and a multi-branch motion to compel, which included request for audio/video recordings from the jail four hours prior to the incident. He also made requests for Rhodes' inmate and criminal history. *See State v. Gannon,* 4th Dist. Lawrence No. 14CA16, 2015-Ohio-1573, at ¶ 20; *State v. Knott,* 4th Dist. Athens No. 03CA06, 2004–Ohio–510, at ¶ 23, (where the record indicated that defense counsel demanded discovery under Criminal Rules 7(E) and 16, defendant's contention that his attorneys did not properly investigate the facts was not credible.) Accordingly, we reject the first and second arguments advanced under Appellant's pro se assignment of error.

    3.  <u>Failure to file merit-worthy motions.</u>

**{¶61}** Appellant also contends that he was denied a fair trial due to the State's failure to provide discovery and trial counsel's failure to file motion to suppress, dismiss, or for mistrial, based on a *Brady* violation. A criminal defendant's due process right to a fair trial is violated when the prosecution withholds materially exculpatory evidence. *State v. Blanton,* -- N.E.3d--, 2018-Ohio-1278, at ¶ 88, citing *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194 (1963); *State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1, ¶ 7; *State v. Johnston,* 39 Ohio St.3d 48, 60, 529 N.E.2d 898 (1988). *Fox, supra,* at ¶ 25.

**{¶62}** Appellant asserts that when the video of the altercation in the jail was first provided to his counsel, counsel was unable to operate it and consequently, made numerous requests for a video he could operate. Eventually Appellant was taken to the prosecutor's office and viewed a video depicting the incident. Appellant further asserts that at trial: (1) the State played a longer video for the jury, which failed to provide a complete depiction of events 45 minutes to an hour before the altercation; (2) trial counsel acknowledged the discrepancy to him; and (3) counsel lodged no objection as to the missing video. As a result, Appellant contends that the State prevented him from preparing a proper defense based upon the actual evidence that the State was planning to present to the jury.

**{¶63}** Furthermore, Appellant argues the discrepancy in the video provided and the video utilized at trial was a *Brady* violation. As such, Appellant asserts his trial counsel should have filed either a motion to suppress the video, a motion to dismiss the indictment against him, or a motion for a mistrial, based on the State's actions. Having not done so, Appellant argues his trial counsel's representation was deficient. Again, we point out that the alleged discrepancy in the video and counsel's alleged recognition of such are matters outside of the record on appeal.

{¶64} A " 'failure to file a suppression motion does not constitute per se ineffective assistance of counsel.' " *State v. Adkins,* ¶ 14, quoting *Madrigal,* 87 Ohio St.3d at 389, quoting *Kimmelman v. Morrison,* 477 U.S. 365, 384, 106 S.Ct. 2574, (1986); *accord State v. Neyland*, 139 Ohio St.3d 353, 2014–Ohio–1914, 12 N.E.3d 1112, ¶ 126. "To establish ineffective assistance of counsel for failure to file a motion to suppress, a defendant must prove that there was a basis to suppress the evidence in question." *State v. Brown*, 115 Ohio St.3d 55, 2007–Ohio–4837, 873 N.E.2d 858, ¶ 65, citing *State v. Adams,* 103 Ohio St.3d 508, 2004–Ohio–5845, 817 N.E.2d 29, ¶ 35. " 'Where the record contains no evidence which would justify the filing of a motion to suppress, the appellant has not met his burden of proving that his attorney violated an essential duty by failing to file the motion.' " *State v. Drummond,* 111 Ohio St.3d 14, 2006–Ohio–5084, 854 N.E.2d 1038, ¶ 208, quoting *State v. Gibson,* 69 Ohio App.2d 91, 95, 430 N.E.2d 954 (8th Dist.1980); *accord Neyland* at ¶ 126.

{¶65} Assuming a prior video did exist, we would not find a *Brady* violation to have occurred. Under the law set forth in *Brady*, to determine if a defendant's alleged due process rights are violated, courts characterize lost or destroyed evidence as (1) "materially exculpatory" or (2) "potentially useful." *Blanton, supra,* at ¶ 88, quoting *State v. Gerald, supra*, at ¶ 15.

Evidence is materially exculpatory " 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " *Johnston, supra*, 39 Ohio St.3d at 61, 529 N.E.2d 898, quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375 (1985). *Fox, supra,* at ¶ 25.

{¶66} Whether evidence is materially exculpatory is a question of law. *See, e.g., Geeslin* at ¶¶ 12–13 (not specifically setting forth standard of review but seemingly reviewing materially exculpatory question as a matter of law). Ordinarily, a defendant bears the burden to prove that withheld evidence is materially exculpatory. *Blanton, supra*; *Fox* at ¶ 26; *Rivas* at ¶ 14; *Lupardus* at ¶ 20. When, however, a defendant specifically requests a particular piece of evidence and that evidence is subsequently lost or destroyed, the burden shifts to the state to show that the evidence was not materially exculpatory. *Lupardus* at ¶ 21. (Internal citations omitted.) The burden does not shift to the state if the defendant makes only a general request for discovery. *Lupardus* at ¶ 22. Instead, for the burden to shift to the state, the defendant must have made a specific request regarding the particular piece of evidence. *Lupardus* at ¶ 22. Thus, when "evidence is destroyed pursuant to routine procedures before any request for it has been

made, it is not the State's burden to show that the evidence was not exculpatory, but rather Defendant's burden to show that it was exculpatory." *State v. Terry,* 2nd Dist. Greene No. 04CA63, 2004-Ohio-7257, at ¶ 15.

{¶67} Here, the record indicates Attorney Raymond Smith, on behalf of Appellant's first counsel of record, Attorney Eric Fowler, filed a general request for discovery early in the case. Attorney Smith filed a motion to preserve evidence, specifically "videos * * * that would concern this case" on November 23, 2016. A second motion to preserve evidence was filed on February 27, 2017. Appellant's trial counsel, Attorney George Cosenza, did not enter an appearance until March 14, 2017. On that date he also filed a specific request for a particular piece of evidence. He filed a motion to compel, which included "any and all audio/video recordings at the Washington County Jail, beginning four hours prior to the incident."

{¶68} At trial, Officer Marry Perry and Lieutenant Jeff Young both testified that the video recording system at the jail is constantly recording. Lieutenant Young testified he automatically preserved a video of the incident, pursuant to jail protocol in such events. To make a video of the incident, he started the recording 1-2 minutes prior to the incident. Lieutenant Young also testified the video is preserved only 30-40 days.

{¶69} In this case, the specific video which Appellant's trial counsel requested was unavailable due to the operation of routine procedures. As such, the burden is on Appellant to demonstrate that the video was materially exculpatory. Appellant contends the missing video which counsel requested would show an incident occurring 45 minutes to an hour prior to the incident on video and viewed by the jury. Appellant testified this prior incident demonstrated Rhodes using racial epithets and making threats of serious bodily harm in an earlier dispute over the television.

{¶70} For the foregoing reasons, we do not find a *Brady* violation in this matter. We disagree that this material, if it existed, would exculpate defendant. As discussed above, the jury was instructed that words alone do not justify the use of violence, no matter how provocative the words are.

{¶71} Appellant's argument is that counsel was ineffective for failing to file a motion to suppress, a motion to dismiss the indictment against him, or file a mistrial based on the *Brady* violation. To prove ineffective assistance on the basis of a failure to file a particular motion, a defendant must establish that the motion stood a reasonable probability of success. *State v. Adkins,* 161 Ohio App. 3d 114, 2005-Ohio-2577, 829 N.E.2d 729 (4th Dist.) at ¶ 14. *See State v. Hollis,* 9th Dist. Stark No. 2004CA00207, 2005-Ohio-1486, at ¶ 25; *State v. Morrison,* 4th Dist. Highland No.

03CA13, 2004-Ohio-5724, at ¶ 10; *State v. Haskell,* 6th Dist. Seneca No. 13–03–45, 2004-Ohio-3345, at ¶ 19. Having found no *Brady* violation, we do not find counsel's representation was deficient for failing to file one of the above-referenced motion.

{¶72} Finally, Appellant also argues his trial counsel was ineffective for failing to object to the jury pool, which did not include any African Americans or anyone in his age peer group. The Sixth Amendment guarantee to a jury trial "contemplates a jury drawn from a fair cross section of the community." *State v. Elmore,* 5th Dist. Licking No. 2005CA32, 2005-Ohio-5940, at ¶ 55, quoting *Taylor v. Louisiana,* 419 U.S. 522, 527, 95 S.Ct. 692, 696, (1975). Appellant argues that his case is a textbook example of a Sixth Amendment violation as the jury did not represent a "fair cross-section" of the community. As such he concludes that he was rendered the ineffective assistance of counsel and denied his right to a fair trial.

{¶73} Our Court considered a similar argument in *State v. Walton,* 4th Dist. Ross No. 03CA2716, 2003-Ohio-6514. There, appellant also asserted that counsel rendered ineffective assistance of counsel for failing to object to the jury pool or the empaneled jury. Our consideration of Walton's argument led us to the Supreme Court of Ohio's decision in *State v. Jones*, 91 Ohio St.3d 335, 339-40, 744 N.E.2d 1163 (2001), wherein the court

discussed the requirement of a jury composed of a cross-section of the

community as follows:

> " '[T]he selection of a petit jury from a representative cross
> section of the community is an essential component of the Sixth
> Amendment right to a jury trial.' *Taylor v. Louisiana*, 419 U.S.
> 522, 528, 95 S.Ct. 692, 697 (1975). However, the Sixth
> Amendment does not require that petit juries 'mirror the
> community and reflect the various distinctive groups in the
> population.' *Id.* at 538, 95 S.Ct. at 702. Under the Sixth
> Amendment, '[d]efendants are not entitled to a jury of any
> particular composition, * * * but the jury wheels, pools of
> names, panels, or venires from which juries are drawn must not
> systematically exclude distinctive groups in the community and
> thereby fail to be reasonably representative thereof.' " *Id.*

**{¶74}** The *Jones* court looked to the decision in *Duren v. Missouri,*

439 U.S. 357, 99 S.Ct. 664 (1979), wherein the United States Supreme Court

held that in order to establish a prima facie violation of the Sixth

Amendment's fair cross-section requirement, a defendant must demonstrate

" '(1) that the group alleged to be excluded is a "distinctive" group in the

community; (2) that the representation of this group in venires from which

juries are selected is not fair and reasonable in relation to the number of such

persons in the community; and (3) that the underrepresentation is due to

systematic exclusion of the group in the jury-selection process.' *Id.* at 364,

99 S.Ct. at 668. *Accord State v. Fulton,* 57 Ohio St.3d 120, 566 N.E.2d

1195, (1991), paragraph two of the syllabus."

**{¶75}** In *Walton,* we noted the first prong of the *Duren* analysis had

been satisfied.  "For purposes of the fair cross-section analysis, African-

Americans are a distinctive group." *Jones (citing United States v. Buchanan*

(C.A.6, 2000), 213 F.3d 302, 310; *United States v. Rioux* (C.A.2, 1996), 97

F.3d 648, 654). *Walton,* at ¶ 27.  However, we found *Walton* had not

established the second or third prongs of the *Duren* analysis.  We held at

¶ 28:

> "The second element requires the defendant to 'demonstrate the
> percentage of the community made up of the group alleged to
> be underrepresented, for this is the conceptual benchmark for
> the Sixth Amendment fair-cross-section requirement.' *Duren,*
> 439 U.S. at 364. Appellant has not presented any evidence as to
> the percentage of African-Americans in the community. Under
> the third prong, the defendant must produce evidence that
> African-Americans are systematically excluded.
> '[U]nderrepresentation on a single venire is not systematic
> exclusion.' *State v. McNeill*, 83 Ohio St.3d 438, 444, 700
> N.E.2d 596 (1998)."

We concluded Walton had not produced any evidence showing that African-

Americans are systematically excluded.  We continued as follows at ¶ 30:

> "Even if the appellant's venire was underrepresentative, the
> appellant has not presented any evidence of 'systematic
> exclusion' as required under the third prong of *Duren.* Appellant
> must do more than show that his particular panel was
> unrepresentative. Where, as here, the trial court relies upon voter
> registration lists, the defendant-appellant "must demonstrate that
> the voter-registration qualifications are suspect, or that the jury-
> selection procedure is administered in a discriminatory manner."
> *United States v. Ireland (*C.A.8, 1995), 62 F.3d 227, 231. There
> is nothing inherently unconstitutional about using voter-

registration rolls as exclusive sources for jury selection. *[State v. Moore,* 81 Ohio St.3d 22, 28, 689 N.E.2d 1 (1998)]. Because appellant has failed to demonstrate systematic discrimination, we reject his Sixth Amendment claim." *State v. Jones*, 91 Ohio St.3d 335, 339-41, 744 N.E.2d 1163 (2001)."

**{¶76}** We ultimately concluded that Walton, like the *Jones* defendant, had not presented any evidence to demonstrate his claim that the jury failed to represent a cross-section of the community. Instead, Walton relied only upon conclusory allegations. The same may be said here.

**{¶77}** While African-Americans are a distinctive group for purposes of the fair cross-section analysis, Appellant has failed to meet the 2nd or 3rd prongs of *Duren.* He has not presented any evidence as to the percentage of African-Americans in Washington County. Nor has he provided any evidence that African-Americans are systematically excluded in Washington County. Appellant's argument relies solely upon conclusory allegations.

**{¶78}** Appellant also asserts his counsel was deficient for failing to object to the jury which did not include anyone in his age group. We also note that a criminal defendant has no affirmative right to a jury of a particular racial, gender or age composition. *Elmore, supra*, at ¶ 56. *See United States v. Mack,* 159 F.3d 208 (6th Cir.1998); *see also Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692 (1975). Here, Appellant has not provided us any case law to support his claim that he was entitled to a jury

with a particular age composition.  Again, Appellant's counsel was not deficient for failing to file a motion which had no likelihood of success.

{¶79} We find no merit to Appellant's argument that his trial counsel was ineffective for failure to object to the jury venire based on race and age. For the foregoing reasons, we find no merit to Appellant's second assignment of error.  It is hereby overruled.

{¶80} Accordingly, after thorough review of the record, we affirm the judgment of the trial court.

**JUDGMENT AFFIRMED.**

Harsha, J., concurring:

{¶81} I concur in the judgment overruling Purvis-Mitchell's assignments of error but write separately to address his pro se assignment of error, which claims that his trial counsel was ineffective for various reasons. Because he relies on purported evidence that is not contained in the record on appeal, I would overrule his assignment of error on that basis. *See State v. Williams*, 4th Dist. Jackson No. 15CA3, 2016-Ohio-733, ¶ 38 ("direct appeal is not the proper vehicle to raise an ineffective-assistance claim premised on evidence outside the record"). Any additional discussion of the merits of his claim is unnecessary.

## <u>JUDGMENT ENTRY</u>

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court to carry this judgment into execution.

<u>IF</u> A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hoover, P.J.:   Concurs in Judgment and Opinion.
Harsha, J.:     Concurs in Judgment Only with Opinion.

For the Court,

BY:   _____
         Matthew W. McFarland

**NOTICE TO COUNSEL**
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**